*In re* KEAST

Docket Nos. 279820, 279834, 279844, and 279845. Submitted January 15, 2008, at Lansing. Decided February 5, 2008. Approved for publication April 1, 2008, at 9:00 a.m.

The Newaygo Circuit Court, Family Division, terminated the parental rights of Erica and Douglas Keast to Alyssa A. and Nicole Keast. Pursuant to MCL 400.203, the circuit court committed the children as state wards to the Michigan Children's Institute (MCI) of the Department of Human Services for permanency planning, supervision, care, and adoptive placement. Before they were committed, the children had been placed temporarily with their maternal grandparents, Timothy and Barbara Atwood, and in foster care with Nicole Coppess. The Atwoods and Coppess separately sought the consent of the MCI superintendent for their adoption of the children. The superintendent denied the Atwoods' request for consent and granted Coppess's request. The Atwoods petitioned the circuit court to allow them to adopt the children and to have grandparent visitation while the adoption remains pending, contending that the MCI superintendent's decision to deny consent was arbitrary and capricious. The court, Terrence R. Thomas, J., agreed with the Atwoods and issued orders terminating the rights of the MCI with respect to the children, granting the Atwoods consent for adoption, denying Coppess's request for consent to adopt, and granting the Atwoods' request for grandparent visitation. The Department of Human Services and Coppess appealed, and the appeals were consolidated.

The Court of Appeals *held*:

1. Under MCL 710.45, a circuit court's review of the MCI superintendent's decision to withhold consent for the adoption of a state ward is limited to determining whether the adoption petitioner has established clear and convincing evidence that the superintendent's withholding of consent was arbitrary and capricious. It is the absence of any good reason to withhold consent, rather than the presence of good reasons to grant it, that indicates that the superintendent has acted arbitrarily and capriciously. On appeal, the circuit court's decision is reviewed for clear legal error. In this case, the circuit court clearly erred in determining that the

superintendent's decision to withhold consent from the Atwoods was arbitrary and capricious. The superintendent had well-documented and well-supported reasons for withholding consent from the Atwoods given the history of illicit drug use in the Atwood family and Mr. and Mrs. Atwoods' failure to protect the children from exposure to illicit drug use.

2. The Atwoods are not entitled to grandparent visitation in light of Coppess's adoption petition and the children's placement for adoption. MCL 722.27b(13) provides that the placement of a child for adoption terminates the right of a grandparent to commence an action for grandparenting time.

Reversed and remanded.

1. ADOPTION — STATE WARDS — CONSENT — MICHIGAN CHILD INSTITUTE SUPER-INTENDENT.

A circuit court's review of a decision by the superintendent of the Michigan Child Institute to deny consent for the adoption of a state ward is limited to determining whether the adoption petitioner has established clear and convincing evidence that the superintendent's withholding of consent was arbitrary and capricious; the circuit court's determination is reviewed on appeal for clear legal error (MCL 710.45).

2. ADOPTION — GRANDPARENTING TIME.

The placement of a child for adoption terminates the right of a grandparent to commence an action for grandparenting time (MCL 722.27b[13]).

*Speaker Law Firm, PLLC* (by *Jodi M. Latuszek* and *Liisa R. Speaker*), for Nicole Coppess.

*Michael A. Cox*, Attorney General, *Thomas L. Casey*, Solicitor General, and *Maribeth A. Dickerson*, Assistant Attorney General, for the Department of Human Services.

*Williams, Hughes & Cook, PLLC* (by *Shon A. Cook*), for Timothy and Barbara Atwood.

Before: FITZGERALD, P.J., and MARKEY and SMOLENSKI, JJ.

PER CURIAM. The Newaygo Circuit Court, Family Division (hereafter referred to as the family court), terminated the parental rights of the minors' father on February 22, 2006, and of their mother, Erica Keast, on May 10, 2006. The court committed the children to the custody of the Department of Human Services (DHS) for permanency planning, supervision, care, and placement pursuant to MCR 400.203. The children became state wards committed to the Michigan Children's Institute (MCI) of the DHS.

Nicole Coppess has provided foster care for Alyssa Ann Keast[1] and Amber Nicole Keast[2] since the latter part of June 2005. She is also seeking to adopt the children. Timothy and Barbara Atwood are the children's maternal grandparents. In Docket No. 279834,[3] the DHS appeals as of right the July 25, 2007, order granting the Atwoods' petition under MCL 710.45(2), ruling that the MCI's decision to withhold consent for adoption by the Atwoods was arbitrary and capricious, terminating the rights of the MCI pursuant to MCL 710.45(8), and making the children permanent wards of the court. In Docket No. 279820, Coppess appeals by leave granted an August 6, 2007, order allowing the maternal grandparents of the children, Timothy and Barbara Atwood, visitation with the children.

FACTS AND PROCEDURAL HISTORY

During the course of the termination proceedings, the children were initially placed with the Atwoods

---

[1] Alyssa's date of birth is December 22, 2000.

[2] Amber's date of birth is August 18, 2002.

[3] Docket Nos. 279844 and 279855 were created by this Court for procedural reasons and do not raise any issues separate from those issues raised in Docket No. 279834.

from March 14, 2005,[4] to June 25, 2005. The children were removed from this placement because of the Atwoods' failure to comply with a no-contact order barring contact with Erica's former boyfriend, and because of Mr. Atwood's use of drugs.[5] Following a meeting held on June 22 and 25, 2005, the children were placed with their maternal uncle and his wife. Within a week of this placement, the uncle and his wife concluded that they could not handle the children, and the children were placed in foster care with Coppess. At that point, the Atwoods appealed the removal of the children from their home. The removal was supported

---

[4] On March 14, 2005, law-enforcement officers raided the home of Erica Keast and her boyfriend. They were arrested for drug trafficking and possession of narcotics. On March 15, 2006, a petition was filed to terminate Erica's parental rights. At a court hearing on May 10, 2006, Erica voluntarily released her parental rights as she continued to struggle with substance abuse.

[5] A June 17, 2005, Court Report Addendum prepared by foster care worker Brian Vanderzalm stated:

Recently, the Agency received a Children's Protective Services complaint involving Mr. and Mrs. Atwood and the children. The complainant alleged Mrs. Atwood threw Amber into the wall. No injuries were reported. A separate complaint was received alleging Mr. Atwood smokes marijuana and has smoked marijuana with Erica Keast. The C.P.S. investigation is underway.

When confronted about using marijuana, Mr. Atwood admitted to using marijuana. He also admitted to smoking marijuana with his daughter, Erica Keast. He claims the last time he used marijuana was approximately three months ago. Mr. Atwood denies using marijuana in front of the children. Mrs. Atwood denies using any drugs.

When confronted about allowing unsupervised visits, Mr. and Mrs. Atwood admitted to allowing Ms. Keast to take the children to Mr. Wingfield's [the boyfriend] home to swim in the pool. Given the fact Mr. Atwood admits to smoking marijuana with his daughter, and allowing unsupervised visitation, potentially placing the children at harm, a change of placement is being considered.

by the Foster Care Review Board (FCRB) and affirmed by the family court. A brief reunion with Erica in December 2005 ended after one week when she attempted suicide in the presence of the children. The Atwoods had no contact with the children from July 1, 2005, until March 2007.

A permanency planning hearing was held in the termination case on March 15, 2006. At that hearing, Erica testified that she started "doing drugs" when she was 12 years old and that her "parents' house was a drug house, they got me into it." Following Erica's release of parental rights on May 10, 2006, the children were committed to the MCI for permanency planning, supervision, care, and adoptive placement under MCL 400.203.

Testimony was presented at a posttermination review hearing held on August 9, 2006, that the children remained in foster care with Coppess.[6] Suzanne Adams of Bethany Christian Services (BCS), the adoption agency under contract with the DHS, testified that the Atwoods were interested in adopting the children. Adams expressed concern because the children were previously removed from the Atwood home, but stated that the agency would conduct a home assessment and evaluation.[7]

BCS prepared an October 26, 2006, adoptive family assessment and a child adoption assessment that recommended that the adoption request be denied. The family assessment indicated that Tim Atwood admitted a long history of drug use, starting at age 16 and ending

---

[6] At that time, Coppess did not think it was in the best interests of the children for her to adopt them. Because of the special needs of the children, Coppess thought that a two-parent family was needed.

[7] Pursuant to MCL 710.43(1)(b), a party seeking to adopt a state ward must obtain the consent of "the authorized representative of the department or of a child placing agency."

in March 2005, and that he admitted to smoking marijuana with Erica in 2004. The assessment concluded that this behavior showed poor self-control, lack of judgment, and failure to put the welfare of the children first. In addition, while the children were in the Atwoods' care, the Atwoods failed to adhere to the parent-agency agreement when they knowingly allowed the children to have unsupervised visitation with Erica and her boyfriend.

The Atwoods objected to the assessment and requested a case conference, which was held on November 17, 2006. The agency subsequently issued a case conference report indicating that the agency stood by its denial of the adoption based on an assessment of possible risks to the children. In a January 17, 2007, letter, William Johnson, the MCI superintendent, sent a letter to the Atwoods informing them that the MCI determined that adoptive placement in their home would not be in the best interests of the children.

On December 12, 2006, before the issuance of Superintendent Johnson's decision, the Atwoods filed a motion for review under subsection 45(2) of the adoption code, MCL 710.45(2). That subsection provides that an adoption petitioner who has been unable to obtain the consent for an adoption required by MCL 710.43(1)(b) may move the court to allow the adoption by showing that the decision to withhold consent was arbitrary and capricious. A hearing under § 45 began on January 3, 2007, attended only by the Atwoods and their counsel. The court stated on the record that it would grant the petition and consent to the adoption by the Atwoods. However, the notice of the § 45 hearing was apparently defective. Another notice of hearing was issued, and a second hearing was held on February 7, 2007.

On that date, the court conducted a posttermination review hearing in the termination of parental rights case immediately before conducting the § 45 hearing. An adoption progress report prepared by BCS on February 6, 2007, stated that the agency was advised on January 17, 2007, that the MCI determined that adoptive placement of the children with the Atwoods was not in the children's best interests and that the agency was to proceed with adoption planning. The report stated that Coppess expressed her desire to adopt the children and that the home study process had begun.

On March 5, 2007, the court issued an order after posttermination review. The court made several findings by way of the order, including a finding that reasonable efforts had not been made toward adoption and that Coppess was reconsidering her decision not to adopt the children. The court terminated the commitment to the DHS, took jurisdiction over the children, and ordered that the children be placed with the Atwoods "by virtue of their petitions to adopt." In the meantime, Superintendent Johnson consented to adoption of the children by Coppess on March 19, 2007.

The DHS filed an emergency application for leave to appeal from the March 5, 2007, order on April 12, 2007. This Court peremptorily reversed the family court's decision by unpublished order entered on April 17, 2007 (Docket No. 277354). The text of this order provides, in part:

> Pursuant to MCR 7.205(D)(2), in lieu of granting the application for leave to appeal, the Court orders that the March 5, 2007 order of the trial court is REVERSED. Where there was evidence that the adoption was proceeding at the time of the review hearing, the court erred in finding that reasonable efforts were not made to place the children for adoption in a timely manner. The court also

erred in placing the children with their maternal grandparents without conducting a review of the best interests of the children. MCL 710.22(g). The court further erred in attempting to revoke its commitment of the children to the Department of Human Services, since such a commitment, once made, is irrevocable. *In the matter of Griffin*, 88 Mich App 184 (1979). The commitment to the Department of Human Services is reinstated, and the children are to be returned to the foster mother forthwith.[8]

On remand, the family court held the Atwoods' § 45 hearing on May 23 and 24, 2007. In an opinion dated June 21, 2007, the family court adopted the Atwoods' proposed findings of fact and law and concluded that Superintendent Johnson's decision to deny the Atwoods consent to adopt was based solely on "selected and edited reports and a telephone conference call with those who generated those reports," and was arbitrary and capricious. The court again terminated the rights of the MCI and made the children wards of the court. On July 25, 2007, the family court entered an order effectuating the ruling. On August 4, 2007, the court granted the Atwoods consent to adopt and denied Coppess's request for consent to adopt.

The Atwoods then filed a petition for grandparent visitation. Following a hearing on the motion on August 2 and 3, 2007, the family court issued an order on August 6, 2007, granting the Atwoods' petition. Coppess filed an emergency application for leave to appeal on August 9, 2007. This Court granted Coppess's application, stayed enforcement of the August 6, 2007, order, and stayed further proceedings pending resolution of this appeal or further order of this Court.

---

[8] An application for leave to appeal was denied by the Supreme Court by order dated September 10, 2007.

DOCKET NO. 279834

The DHS first argues that the family court erred in finding clear and convincing evidence that the MCI superintendent acted arbitrarily and capriciously in denying the Atwoods consent to adopt. We agree.

Pursuant to MCL 710.45, a family court's review of the superintendent's decision to withhold consent to adopt a state ward is limited to determining whether the adoption petitioner has established clear and convincing evidence that the MCI superintendent's withholding of consent was arbitrary and capricious. Whether the family court properly applied this standard is a question of law reviewed for clear legal error. *Fletcher v Fletcher*, 447 Mich 871, 877; 526 NW2d 889 (1994).

The MCI superintendent represents the state of Michigan as guardian of all children committed to the state by a family court after termination of parental rights. MCL 400.203. The superintendent is authorized to consent to the adoption of any child committed to the MCI as a state ward. MCL 400.209. Consent by the superintendent to the adoption of a state ward is required before the family court can approve a prospective adoption. MCL 710.43(1)(b). Under MCL 710.45(2), a person who has filed a petition to adopt a state ward and has not received consent from the MCI may file a motion in family court to challenge the MCI superintendent's denial of consent.

MCL 710.45 states, in part:

(1) A court shall not allow the filing of a petition to adopt a child if the consent of a representative or court is required pursuant to section 43(1)(b), (c), or (d) of this chapter unless the petition is accompanied by the required consent or a motion as provided in subsection (2).

(2) If an adoption petitioner has been unable to obtain the consent required by section 43(1)(b), (c), or (d) of this chapter, the petitioner may file a motion with the court alleging that the decision to withhold consent was arbitrary and capricious. . . .

\* \* \*

(7) Unless the petitioner establishes by clear and convincing evidence that the decision to withhold consent was arbitrary and capricious, the court shall deny the motion described in subsection (2) and dismiss the petition to adopt.

(8) If the court finds by clear and convincing evidence that the decision to withhold consent was arbitrary and capricious, the court may terminate the rights of the appropriate court, child placing agency, or department and may enter further orders in accordance with this chapter or section 18 of chapter XIIA as the court considers appropriate. In addition, the court may grant to the petitioner reimbursement for petitioner's costs of preparing, filing, and arguing the motion alleging the withholding of consent was arbitrary and capricious, including a reasonable allowance for attorney fees.

Pursuant to *In re Cotton,* 208 Mich App 180, 184; 526 NW2d 601 (1994), the family court is not permitted to decide the adoption issue de novo, but rather must determine whether there is clear and convincing evidence that the decision maker acted arbitrarily and capriciously. The generally accepted meaning of "arbitrary" is " 'determined by whim or caprice,' " or " 'arrived at through an exercise of will or caprice, without consideration or adjustment with reference to principles, circumstances, or significance, . . . decisive but unreasoned.' " *Goolsby v Detroit,* 419 Mich 651, 678; 358 NW2d 856 (1984) (internal quotation marks and citations omitted). The generally accepted meaning of

"capricious" is "apt to change suddenly; freakish; whimsical; humorsome." *Id.* (internal quotation marks and citations omitted).

The initial focus of the hearing is on the reasons given for withholding consent to the adoption. *In re Cotton, supra* at 185. It is the absence of any good reason to withhold consent, rather than the presence of good reasons to grant it, that indicates that the decision maker has acted arbitrarily and capriciously. *Id.* at 185. The Court explained:

> [T]he focus is not whether the representative made the "correct" decision or whether the probate judge would have decided the issue differently than the representative, but whether the representative acted arbitrarily and capriciously in making the decision. Accordingly, the hearing under § 45 is not . . . an opportunity for a petitioner to make a case relative to why the consent should have been granted, but rather is an opportunity to show that the representative acted arbitrarily and capriciously in withholding that consent. It is only after the petitioner has sustained the burden of showing by clear and convincing evidence that the representative acted arbitrarily and capriciously that the proceedings may then proceed to convincing the probate court that it should go ahead and enter a final order of adoption. [*Id.* at 184.]

In his "Consent to Adoption Decision" Superintendent Johnson identified the factors he considered in denying consent to the Atwoods, including:

> • Alyssa and Amber were placed with their maternal grandparents, Timothy and Barbara Atwood, on March 14, 2005 but removed on June 25, 2005 when it was discovered that they had allowed unsupervised visits between the children and their birth mother. In at least one instance this resulted in the children having contact with the mother's boyfriend in spite of a court order prohibiting any contact. Mr. and Mrs. Atwood maintain that the agency's

instructions in regard to visitation were non-specific and they understood that they could use their own discretion. However Mr. Atwood acknowledged to the Foster Care Review Board at a hearing held on July 13, 2005 that they were aware they were to supervise any contact between the children and their mother and that the children were not to have contact with her boyfriend. Adoption policy specifically cites a relative's inability to protect children from the birth parents for denial of consent to adoption.

• Timothy Atwood admitted to smoking marijuana with his daughter, the children's mother, in 2004. He did this in spite of the fact that the daughter had a history of substance abuse and mental health problems. While Mr. Atwood indicates that he gave in to his daughter's pleading, this raises serious questions about his judgment as well as his ability to make the children's interests a priority. Furthermore, Mr. Atwood acknowledges that he has a history of using hard drugs, quitting 28 years ago, and smoking marijuana until March of 2005. He has never participated in a drug treatment program. While he insists he has no current substance abuse problems, given his history there remains a risk of relapse.

• Alyssa and Amber have made significant progress since being placed in foster care. However, they continue to struggle with emotional and behavioral problems. The Atwoods blame these problems on the fact that the children were removed from their care. They don't appear to recognize that the girls have been negatively impacted by many factors, including their early childhood experiences. This lack of insight could prevent them from dealing effectively with the children's mental health issues. The children's therapist feels that their present placement has been beneficial and that returning to the grandparents would be detrimental to their mental health.

At the § 45 hearing, Superintendent Johnson testified that he received and reviewed a packet of material provided by BCS, including the child adoption assessment on both children, the adoptive family assessment, court orders, the case conference report, the Atwoods'

written rebuttal to the adoption assessment, and reference letters submitted by the Atwoods. Superintendent Johnson indicated that he has a reasonable expectation that the information provided through state-contracted and licensed agencies is accurate and that he can rely on it. However, because the adoptive family assessment referred to a substance abuse evaluation of Mr. Atwood that indicated that Atwood stated that he had not used marijuana since 2005 after an extensive drug use history,[9] Superintendent Johnson investigated further and concluded:

> The information that I was presented at that time, now the information I received from the agency was in the end of October 2006, I'm getting to it in late December early January. I wondered about whether or not we should take another look at considering placing the children with the grandparents particularly because at that time the information that I received was that the children's foster mother who they were living with since 2005, was not interested in adoption of the children for I think reasons that I understood to be very valid reasons. So, based on

---

[9] The family assessment indicates that Tim answered the following question as indicated in italics:

Have you had a history of or presently have a problem with use of drugs, alcohol, or any eating disorders:

*Tim says that he used marijuana from the age of 16 until March of 2005. He says he stopped using marijuana because he got tired of it. (Note: Tim requested that a drug screen be done and the urinalysis performed by his physician in July 2006 came back clean. He also had a Substance Abuse Assessment performed by Arbor Circle Counseling Services. He was diagnosed 305.20 Cannabis Abuse in Sustained Remission, which was based on his self report along with verifications from Barb and meeting one indicator of Substance Abuse "Recurrent use resulting in failure to fulfill role obligations." This diagnosis was based on Tim's report of smoking cannabis in the presence of his daughter. Due to his reported abstinence of cannabis for over one year, no treatment was recommended at this time.)*

that information I was unsure that I agree with the recommendation of the agency, and I wanted—I also realized that Bethany Christian Services was coming into the game kind of late in the game so to speak, that they were the adoption agency. There continued to be the Newaygo County DHS involved as the foster care agency primarily the foster care agency, and so I wanted to have a case conference, a telephone conference to get the information from the people that had been involved with this case for the last two—two plus years, to discuss the facts that I thought need to be considered in making a decision about Bethany's recommendation not to approve the Atwoods.

In an effort to gather more information, Superintendent Johnson convened a telephone conference call with the regional adoption workers, Newaygo County DHS, Lake County DHS, and BCS to further inquire into the Atwoods' adoptive family assessment information. He wanted to give the Atwoods another look and to speak with the professionals who were involved with the children and their biological family over the past two years. After doing further investigation, he remained concerned about the Atwoods' adoption of the children due in part to the multigenerational history of substance abuse in the family:

[T]he grandfather of the children and the parent of the children using illegal drugs outside of the home while the children are present, that it's a bad example of Mr. Atwood for his daughter. It's a bad parenting ability for care of the children by their mother, and also I guess information that I obtained from the agency and from the county office was that there was—substance abuse was a major reason and a major factor that led to neglect of the children. They were removed from parental custody following a drug raid at the home. I'm concerned that the grandparents seem to minimize substance abuse problems that might affect the children.

The Atwoods alleged below that Superintendent Johnson made his decision in an arbitrary and capricious manner because he did not review the psychological and substance abuse assessments compiled on Tim Atwood, but rather relied on the summary of these reports prepared by BCS. In adopting the Atwoods' findings of fact as its own, the court found that the decision to deny consent was arbitrary and capricious because "MCI did not review psychological reports and drug and alcohol assessments of Tim Atwood, but indicated that there was a strong likelihood of Mr. Atwood continuing the illegal use of substances." However, the record reveals that the summary of the drug and alcohol assessment contained in the October 26, 2006, adoptive family assessment did not contradict, and indeed quoted in part, the written report. The psychological report is dated October 19, 2006, but the record does not indicate the date that the report was received by BCS. Thus, although the adoptive family assessment was signed on October 26, 2006, there is no evidence that BCS received the report before completing the adoptive family assessment. Nevertheless, the psychologist and the substance abuse counselor both testified at the hearing, and their reports were admitted as exhibits. Superintendent Johnson testified that the testimony he heard from the psychologist and the substance abuse counselor did not change his opinion and that the assessment summaries were considered in the context of the rest of the case history. He indicated that the actual assessments and the testimony of the psychologist and substance abuse counselor did not change his opinion that the Atwoods' home would not be a good placement for the children. Superintendent Johnson's reliance on summaries of reports and recommendations from BCS was not unfounded.

Further, the facts supporting Superintendent Johnson's concern about drug use, relapse, and multigenerational drug dependence are clear from the record and Tim Atwood's own testimony at the § 45 hearing. Tim Atwood testified at the hearing that the social use of marijuana is okay, that he uses marijuana on occasion, and that he *probably* would not use marijuana if the children were placed in his custody, but that *he might*. Additionally, the record reflects that Tim smoked marijuana with Erica as recently as March 7, 2005, one week before Erica lost custody of the children because of her drug use, and while the children were in the home. And, the adoptive family assessment indicates that Erica alleged in court in November 2005 that Tim used to "roll joints" and smoke them with her when she was as young as age 14.

The family court also adopted the Atwoods' proposed finding that the decision to deny consent was arbitrary and capricious because the removal of the children from the Atwoods' home in 2005 was based on inaccurate information that was given to the court and was never litigated or fully heard. The record does not support this claim.

After the children were removed from the home, the Atwoods appealed the removal to the FCRB. Following a hearing, the board supported the decision to remove the children. The Atwoods appeared at a hearing before the board. The board supported the removal and made the following findings:

> 1. Based on the Agency's representations, we find that the Agency wanted to remove Alyssa (age 5) and Amber (age 2) from Tim and Barbara Atwood's care, in sum, because the Agency believed that Mr. and Mrs. Atwood were not meeting Alyssa and Amber's needs. Specifically, the Agency asserts that:

a. Ms. Sholty of the Newaygo County Department of Human Services is the direct care caseworker assigned to the children and Mr. Vanderzalm was the previous direct care caseworker prior to being promoted to Program Manager.

b. According to Mr. Vanderzalm, there were two primary reasons the Agency removed the children:

1) The admitted drug use by Mr. Atwood.

2) Mr. and Mrs. Atwood were not in compliance with the Agency's rule regarding the children having contact with their mother's boyfriend during parenting times. There is a no contact order, as part of the Department of Human Services Parent Agency Treatment Plan and Service Agreement, between the children and Ms. Keast's boyfriend.

Mr. Vanderzalm indicated that allegations of Mr. Atwood smoking marijuana with his daughter were received by the Agency. During the Agency's investigation of these allegations, they subsequently discovered that Ms. Keast was having an unauthorized number of contacts with the children and allowing her boyfriend to be around her children. Mr. Vanderzalm indicated that Mr. Atwood admitted using marijuana, although he minimizes his usage of marijuana, and also admitted to allowing the children to visit their mother and boyfriend's residence unsupervised. This was discussed with Mr. and Mrs. Atwood at the time of the initial investigation and the Agency discovered that they then allowed the children to return to their mother's home after being warned not to allow this to happen.

The board further noted that

Mr. Atwood indicated that they were aware they were to supervise the contact between the children and their mother and that the children were not to have contact with her boyfriend. . . . When questioned by the Board concerning the supervision of the children when they were with their mother, Mr. Atwood admitted he understood they were to supervise those contacts but did not do so.

The board concluded that the agency demonstrated that the children were at risk of harm, that their needs were not being met, and that moving them was in their best interests. The family court affirmed the decision to remove the children from the Atwoods' home in June 2005. This information was provided to Superintendent Johnson, and it provides a good reason for Superintendent Johnson's decision that the Atwoods would be unable to protect the children from Erica.

Contrary to the Atwoods' allegation that they were unaware of the terms of the parent-agency agreement, Tim admitted at the § 45 hearing that he had told FCRB on July 13, 2005, that he was aware he was to supervise Erica's visitation and that the children were not to have contact with Erica's boyfriend, but claims that he did not learn this information until June 17, 2005. However, the foster care worker, Brian Vanderzalm, testified that he told the Atwoods at his first visit in May 2005 and on multiple subsequent occasions that Erica could not have unsupervised visitation with the children. Vanderzalm testified that the Atwoods allowed Erica to take the children to Erica's boyfriend's home, which was a known drug house, despite being told not to allow it. Additionally, the initial services plan dated April 25, 2005, and filed on May 10, 2005, states under "Foster Parent/Kinship Caregiver Activities" that "[t]he foster parents/kinship caregivers agree not to allow the children's parents to have unsupervised visitation with the children, unless authorized by the D.H.S. or the court." Under "Parenting Time," the plan states, "Currently parenting time is offered on a daily basis, supervised by Timothy and Barbara Atwood, the children's grandparents." The initial services plan also states, "This plan was developed in coordination with Erica Keast, the children's mother, and Timothy and Barbara Atwood, the children's grandparents."

The trial court also adopted the Atwoods' proposed finding that "the decision to deny the Atwoods adoption was based upon the bias of the DHS worker and the adoption worker in wanting a different adoptive family." However, at the time the superintendent denied consent in January 2007 he was not aware of any other prospective adoptive parents. Indeed, at that time Coppess had not applied to adopt the children. The record does not support the trial court's finding that the DHS workers and adoption worker were biased and preferred a different adoptive family. While it is true that the workers asked Coppess about her desire to adopt in light of the fact that the children had been placed in her care for a lengthy period and were doing well in her care, it is apparent that the workers made the inquiry because they were aware of potential problems with the Atwoods' being granted consent to adopt. No evidence of bias in favor of Coppess can be found in the record.

The trial court also adopted the Atwoods' proposed finding that Superintendent Johnson's decision to deny consent was arbitrary and capricious because it violated the MCI's own protocol that "a blood relative always takes precedence over a foster family, absent 'extraordinary circumstances.' " This finding is not an accurate portrayal of Superintendent Johnson's testimony:

> With regard to the—the DHS's adoption policy our policy does encourage consideration of relatives at the time that the plan becomes adoption, and also consideration of foster parents and others with whom the children have a relationship. So, it does—it doesn't say, I don't believe it says that children will be placed with relatives, but it does—it does clearly give consideration, relatives will be considered, given consideration for purposes of adoption.

\* \* \*

> There is a preference . . . to give consideration to per-
> sons that the children are related to or have an emotional
> attachment to.
>
> * * *
>
> . . . I think there's a preference for giving relatives
> consideration for adoption placement, not—I would not go
> so far as to say there's a preference for placing them with
> relatives.

Contrary to the family court's finding, Superintendent Johnson was aware of MCI's adoption guidelines, which provide for consideration of all those with whom the children have a relationship.

The family court also found that Superintendent Johnson's decision to deny consent was arbitrary and capricious because there were no other prospective adoptive parents that came forward or that were considered for adoption. This finding is clearly erroneous in the context of the § 45 hearing. The interest of others in adopting the children has no relevance to the bases for Johnson's denial of the Atwoods' request for consent to adopt. *In re Cotton, supra* at 184-185.

The family court also found that Superintendent Johnson's decision to deny consent was arbitrary and capricious because there was a bias in favor of placing the children with a different adoptive family. But a review of the record simply does not support any reasonable inference that anyone "conspired" to place the children with Coppess. Furthermore, as reflected in Johnson's discussion of adoption policy considerations, the policy guideline in favor of adoptive placement with an existing foster family, where the children had resided for over two years, overrode other potential policy considerations. Indeed, Superintendent Johnson noted:

Alyssa and Amber have made significant progress since being placed in foster care. However, they continue to struggle with emotional and behavioral problems. The Atwoods blame these problems on the fact that the children were removed from their care. They don't appear to recognize that the girls have been negatively impacted by many factors, including their early childhood experiences. This lack of insight could prevent them from dealing effectively with the children's mental health issues. The children's therapist feels that their present placement has been beneficial and that returning to the grandparents would be detrimental to their mental health.

The family court clearly erred in determining that the Atwoods established by clear and convincing evidence that Johnson's decision to deny consent was arbitrary and capricious. As the *Cotton* Court explained, it cannot be said that a decision is arbitrary and capricious if there exists a good reason for it. *In re Cotton, supra* at 185. Superintendent Johnson's decision was overwhelmingly supported by the documentation provided to him as well as by his independent investigation and it was not arbitrary or capricious.[10] Accordingly, we reverse the family court's ruling that Superintendent Johnson's denial of consent was arbitrary and capricious, and we remand the case to the family court for dismissal of the Atwoods' petition to adopt. See MCL 710.45(7). Because a finding that the decision to withhold consent was arbitrary and capricious is required before the court may terminate the rights of the MCI, see MCL 710.45(8), our reversal of

---

[10] As previously stated, the focus of the § 45 hearing was not whether Superintendent Johnson made the "correct" decision, or whether the family court would have decided the issue differently, nor was it an opportunity for the Atwoods to make a case relative to why the consent should have been granted.

the family court's decision necessarily results in recommitment of the children to the MCI for permanency planning and adoption.

DOCKET NO. 279820

Coppess challenges the family court's order granting the Atwoods' request for grandparent visitation. However, we need not address these arguments in detail in light of our conclusion that the family court erred by concluding that Superintendent Johnson's decision to deny consent to the Atwoods was arbitrary and capricious, and therefore erred by revoking the children's commitment to the MCI for permanency planning. Thus, the children remain committed to the MCI for permanency planning, supervision, care, and adoptive placement. Because Superintendent Johnson has granted consent to adopt to Coppess[11] and the children remain placed with her for adoption, the Atwoods are not entitled to grandparenting time. MCL 722.27b(13) clearly provides that the placement of a child for adoption terminates the rights of a grandparent to commence an action for grandparenting time.[12] We therefore reverse the order granting grandparent visitation.

The order in Docket No. 279834 granting the Atwoods' petition under MCL 710.45(2) is reversed and the case is remanded to the trial court for dismissal of the Atwoods' petition to adopt. The order in Docket No.

---

[11] Superintendent Johnson granted consent to adopt to Coppess on March 19, 2007.

[12] Although not relevant to this appeal, we note that MCL 722.27b(13) provides that adoption of a child by a stepparent under the Michigan Adoption Code does not terminate the right of the parent of a deceased parent of the child to commence an action for grandparenting time with that child.

279820 granting the Atwoods grandparenting time is reversed. Jurisdiction is not retained.