# STATE OF MICHIGAN

# COURT OF APPEALS

---

*In re* RC, Minor.

---

LUCINDA CARRIER,

       Petitioner-Appellee,

v

MICHIGAN CHILDREN'S INSTITUTE,

       Respondent-Appellant.

UNPUBLISHED
January 3, 2019

No. 343736
Wayne Circuit Court
Family Division
LC Nos. 17-000510-AO
           14-518511-NA

---

Before: M. J. KELLY, P.J., and METER and O'BRIEN, JJ.

O'BRIEN, J. (*dissenting*)

I respectfully dissent. This case is not about whether the superintendent properly denied petitioner consent to adopt RC. Rather, this case is about whether the trial court utilized the proper standard when reviewing the superintendent's decision. The trial court's review of the superintendent's decision was limited by MCL 710.45, under which "a family court's review of the superintendent's decision to withhold consent to adopt a state ward is limited to determining whether the adoption petitioner has established clear and convincing evidence that the MCI superintendent's withholding of consent was arbitrary and capricious." *In re Keast*, 278 Mich App 415, 423; 750 NW2d 643 (2008). In turn, we review whether the trial court "properly applied" MCL 710.45 to the superintendent's decision, which "is a question of law" that we review "for clear legal error." *Id*. In *Fletcher v Fletcher*, 447 Mich 871, 881; 526 NW2d 889 (1994) (opinion of BRICKLEY, J.), our Supreme Court explained that there is no distinction between "clear legal error" and "ordinary 'legal error,' " so a court commits clear legal error when it "incorrectly chooses, interprets, or applies the law[.]" Because I would conclude that the trial court misapplied MCL 710.45, I would reverse the trial court and reinstate the superintendent's decision to deny petitioner consent to adopt RC.

This case arises out of the voluntary release of parental rights to RC by her birth parents during child protective proceedings related to abuse and neglect. Those proceedings were instituted after petitioner, who is RC's paternal aunt, reported the parents' neglect of RC to Child Protective Services (CPS). RC was removed from her parents' care in December 2014—when she was five months old—and placed with petitioner, with whom she remained for more than two years. A lawyer-guardian ad litem (the LGAL) was appointed to represent RC and remained

-1-

in that position throughout the proceedings below. The LGAL believed that petitioner was a "good choice" for RC's placement, opining that petitioner provided the child with "excellent care." In the April 30, 2016 order terminating the birth parents' rights, RC was committed to the custody of the Department of Health and Human Services (DHHS). Upon her commitment to the DHHS, RC became a ward of the state and, by operation of MCL 400.203(1), Michigan Children Institute's (MCI) superintendent became RC's guardian.

Before March 20, 2017, there had been "nothing of any concern" that would have prevented the superintendent giving petitioner consent to adopt RC. Indeed, at that time, petitioner's request for consent to adopt was likely "days away" from receiving the superintendent's approval. But on March 20, 2017, petitioner left RC at the home of her paternal grandfather, who is elderly and has limited mobility. RC's biological father also lives in the home, along with another child and several other adults, who were also present. After petitioner left, RC and the other child—both still in diapers—were not properly supervised and went outside alone, without shoes or weather-appropriate attire. A concerned neighbor called the police and kept the children from wandering into the street.

As a result of the March 20, 2017 incident, CPS instituted an investigation. Following that investigation, on June 9, 2017, RC was removed from petitioner's care and placed with a new foster family. On September 7, 2017, the superintendent denied petitioner's request for consent to adopt RC. In making her decision to deny consent to adopt, the superintendent was aware that petitioner had provided a safe home for the child for more than two years, that RC was strongly bonded to petitioner, and that petitioner was the individual who had initially protected RC from her parents' abuse by filing the CPS report that initiated the child protective proceedings. The superintendent indicated that she reviewed a large "packet" of information provided by petitioner, which cited numerous reasons militating in favor of granting petitioner consent to adopt RC. The superintendent also acknowledged that, as a general rule, she prefers to place children with family members for adoption if possible and will give preference to such individuals over nonfamily. Despite these considerations, the superintendent denied petitioner consent to adopt because of, among other things, (1) petitioner's credibility, particularly with regard to her statements that she would never leave RC at the grandfather's house again or in similarly inappropriate circumstances, (2) the concerns for RC's safety and well-being expressed during "fairly lengthy conferences" by caseworkers from, among others, CPS, the adoption agency, and the foster care review team, (3) petitioner's inconsistent prior statements concerning whether her not-agency-approved 18-year-old brother had been providing daycare to RC before the March 20, 2017 incident, (4) petitioner's failure to duly report any change in daycare as soon as it occurred, which was a foster-care licensing violation, (5) the March 20, 2017 incident in general, its potential lethality for RC, and petitioner's inability to identify which of the "unreliable individuals" who were present during that incident—all of whom later denied that they had been placed in charge of RC—had actually been charged with supervising RC, (6) concerns that petitioner might, in the future, cave to familial pressure to permit RC's biological father to spend time with RC, (7) the seeming deterioration of the bond RC felt toward petitioner following her removal from petitioner and placement with another foster family, and (8) RC's high degree of attachment to her new foster family after several months of placement with them, RC's fear of being separated from her new foster family and seeming preference for them over petitioner, the superintendent's observation that RC seemed "extremely happy" with the new foster family, and the possibility of "devastating" repercussions for RC if she was removed from

the new foster family. The superintendent highlighted the importance of the last factor, stating that "if it hadn't of [sic] been for the way [RC] had responded" to the new foster family, the superintendent may have granted petitioner consent to adopt.

Petitioner filed a motion for review of the superintendent's decision under MCL 710.45 (the § 45 motion). The § 45 hearing took place over the course of five days in February and March of 2018. Ultimately, the trial court held that respondent had proven, by clear and convincing evidence, that the superintendent's decision to deny consent to adopt was arbitrary and capricious. On appeal, MCI argues that the trial court committed clear legal error by so ruling. I agree.

As explained earlier:

> Pursuant to MCL 710.45, a family court's review of the superintendent's decision to withhold consent to adopt a state ward is limited to determining whether the adoption petitioner has established clear and convincing evidence that the MCI superintendent's withholding of consent was arbitrary and capricious. Whether the family court properly applied this standard is a question of law reviewed for clear legal error. [*In re Keast*, 278 Mich App at 423.]

A court commits "clear legal error" when it "incorrectly chooses, interprets, or applies the law[.]" *Fletcher*, 447 Mich at 881 (opinion of BRICKLEY, J.).

Under MCL 400.203(1), MCI's superintendent "shall represent the state as guardian of each child committed" to the DHHS "beginning with the day the child is admitted and" generally "continuing until the child is 19[.]" "The superintendent of the institute has the power to make decisions on behalf of a child committed to the institute," MCL 400.203(2), and "[c]onsent by the superintendent to the adoption of a state ward is required before the family court can approve a prospective adoption," *In re Keast*, 278 Mich App at 423.

As for the "general purposes" of the Adoption Code, MCL 710.21a provides:

> The general purposes of this chapter are:
>
> (a) To provide that each adoptee in this state who needs adoption services receives those services.
>
> (b) To provide procedures and services that will safeguard and promote *the best interests of each adoptee*[1] *in need of adoption* and that will protect the rights of all parties concerned. *If conflicts arise between the rights of the adoptee and the rights of another, the rights of the adoptee shall be paramount.*

---

[1] For these purposes, the phrase "best interests of the adoptee" is statutorily defined by MCL 710.22(g).

(c) To provide prompt legal proceedings to assure that the adoptee is free for adoptive placement at the earliest possible time.

(d) *To achieve permanency and stability for adoptees as quickly as possible.*

(e) To support the permanency of a finalized adoption by allowing all interested parties to participate in proceedings regarding the adoptee. [Emphasis added.]

In *In re Cotton*, 208 Mich App 180, 184; 526 NW2d 601 (1994), this Court explained the scope of a trial court's review under MCL 710.45 of the superintendent's decision to withhold consent to adopt:

The fact that the Legislature in drafting the statute limited judicial review to a determination whether consent was withheld arbitrarily and capriciously, and further required that such a finding be based upon clear and convincing evidence, clearly indicates that it did not intend to allow the probate court to decide the adoption issue de novo and substitute its judgment for that of the representative of the agency that must consent to the adoption. Rather, the clear and unambiguous language terms of the statute indicate that the decision of the representative of the agency to withhold consent to an adoption must be upheld unless there is clear and convincing evidence that the representative acted arbitrarily and capriciously. Thus, the focus is not whether the representative made the "correct" decision or whether the probate judge would have decided the issue differently than the representative, but whether the representative acted arbitrarily and capriciously in making the decision. Accordingly, the hearing under § 45 is not . . . an opportunity for a petitioner to make a case relative to why the consent should have been granted, but rather is an opportunity to show that the representative acted arbitrarily and capriciously in withholding that consent. It is only after the petitioner has sustained the burden of showing by clear and convincing evidence that the representative acted arbitrarily and capriciously that the proceedings may then proceed to convincing the probate court that it should go ahead and enter a final order of adoption.

In other words, the superintendent's denial of consent to adopt in a given case cannot be held as arbitrary and capricious "if there exists a good reason for it," and this remains true even if there are good reasons militating in favor of the opposite result. *In re Keast*, 278 Mich App at 415; see also *In re ASF*, 311 Mich App 420, 436; 876 NW2d 253 (2015) (explaining that if good reasons exist both for granting and withholding consent to adopt, then "it cannot be said that the representative acted arbitrarily and capriciously in withholding that consent") (quotation marks and citation omitted.)

As alluded to earlier, the narrow issue on appeal is whether the trial court erred by incorrectly choosing, interpreting, or applying the law. In other words, as was true of the trial court, this Court's review is not de novo, and we are not called upon to decide whether we agree with the superintendent's decision.

While the trial court clearly *chose* the correct law, I would conclude that it *misapplied* that law. It did so by disregarding or discounting at least two "good reasons" that the superintendent emphasized were important to her decision. First, the trial court completely disregarded the superintendent's safety concerns stemming from petitioner's admission that she had permitted her 18-year-old brother, who was not an approved substitute caregiver (i.e., had not been subject to agency background checks), to provide daycare for RC.[2] Indeed, the trial court's opinion does not mention the rather extensive testimony concerning the brother, instead seeming to confuse the evidence about him with evidence about petitioner's *other* brother (i.e., RC's biological father). Given that the superintendent described petitioner's admitted reliance on unapproved substitute care providers as "an important issue" and a "big concern of everyone," the trial court misapplied the law—and therefore committed clear legal error—by failing to consider the matter.[3]

The trial court also erred by refusing to consider another reason that the superintendent gave for withholding consent to adopt: RC's strong bond to her new foster family, RC's apparent preference for her new foster family over petitioner, and the potential damaging repercussions to RC if she was removed from her foster family. It seems that, based on the trial court's conclusion that RC should never have been removed from petitioner in the first instance, the trial court refused to consider the superintendent's reliance on RC's placement and circumstances *following* removal. In pertinent part, the trial court reasoned:

> And even if there was some awkwardness [between RC and petitioner] . . . it was caused by a removal which was unjustified in the first place, [so] this should not now be allowed to serve as a reason to deny consent.

> * * *

> [The superintendent's] claim that there was no appropriate bond because of the awkward lack of engagement at a visit observed three months after removal from [petitioner's] care is not a valid reason for denial, when as pointed out above, there was no valid reason for the removal in the first place.

> * * *

> Furthermore, [the superintendent's] fear that [RC] will be traumatized by being reunited with her "mommy," [petitioner], is not a valid reason for denial

---

[2] The trial court seemed to dismiss the importance of the agency's substitute-caregiver policies as nothing more than bureaucratic red tape. But it is not the judiciary's role to second-guess the wisdom of policy judgments made by coequal branches of government. *Allard v Allard*, 318 Mich App 583, 603 n 6; 899 NW2d 420 (2017).

[3] The majority, like the trial court, does not mention this stated reason. Nor does the majority explain how the trial court's mistake in not addressing this reason does not amount to a misapplication of the law.

when, as stated above, any issues [RC] may have with reunification are a result of [the superintendent's] initial unnecessary decision to remove [RC] from [petitioner's] care when she was not at risk. Returning [RC] to [petitioner] from a much shorter stay in foster care to her "mommy" of two and a half years should be much less challenging than the original removal.

As the Courts of this state have repeatedly noted, actions that impact the rights, care, or custody of minor children are inherently different than other types of legal proceedings. See, e.g., *Allard v Allard*, 318 Mich App 583, 601; 899 NW2d 420 (2017) ("Time and again, our Courts have recognized that the parties to a divorce cannot, even by mutual agreement, relieve a circuit court of its duty to independently safeguard the interests of minor children who are involved."); *In re Medina*, 317 Mich App 219, 239; 894 NW2d 653 (2016) ("[t]he primary beneficiary of the best-interest analysis is intended to be the child") (quotation marks and citation omitted); *In re Bibi Guardianship*, 315 Mich App 323, 335; 890 NW2d 387 (2016) ("In situations such as this, when our courts are entrusted with safeguarding the interests of minor children, res judicata must be applied with great care."). Our Legislature echoed a similar sentiment in MCL 710.21a(b), noting that, for purposes of the Adoption Code, "[i]f conflicts arise between the rights of the adoptee and the rights of another, the rights of the adoptee shall be paramount." Put differently, "[t]he best interests of the adoptee are the overriding concern," not those of the other stakeholders. *In re ASF*, 311 Mich App 420, 435; 876 NW2d 253 (2015).

The trial court here lost sight of this fundamental principle, shifting its focus primarily to what it perceived as unfairness to *petitioner* resulting from the superintendent's decision to remove RC. But the proceedings under MCL 710.45 did not entail review of the *removal* decision; the trial court's only inquiry was whether the superintendent's decision to *deny consent to adopt* was arbitrary and capricious. And in order to make that determination, the trial court needed to consider the superintendent's reasons for denying consent, including what the court recognized as her "primary" reason: her concern that, since removal, RC's bond with petitioner had withered, while her bond with her new foster parents had flourished. By not addressing the superintendent's consideration of RC's placement and strong bond to the new foster family— dismissing such considerations as the inequitable results of an improper removal decision—the trial court ended up valuing petitioner's interests more highly than those of RC.[4]    More

---

[4] The trial court's disregard of RC's *actual* circumstances (including her placement with a new foster family) is especially troubling because of its temporal context. RC was removed from petitioner and placed with her new foster family in early June of 2017. Petitioner filed her § 45 motion on November 28, 2017, and the initial hearing took place on December 20, 2017, at which time RC had already been placed with her new foster family for more than six months. Despite the requirement in MCL 710.45(6) that a trial court "shall decide" a § 45 motion "within 91 days after the filing of the motion unless good cause is shown," and that adoption proceedings must "be considered to have the highest priority and shall be advanced on the court docket so as to provide for their earliest practicable disposition," MCL 710.25(1), the trial court did not rule on petitioner's § 45 motion until April 19, 2018, nearly five months after it was filed and almost a year after RC had been placed with the new foster family.

importantly, the trial court shirked its duty to consider one of the principal reasons the superintendent gave in support of her decision. For this reason as well, I would conclude that the trial court misapplied the law and, by doing so, committed clear legal error.

This is not to suggest that the trial court's reaction to the evidence here is inconceivable or even unexpected. With the benefit of hindsight, the removal decision may have been somewhat rushed and possibly misguided. Given that petitioner had been acting as RC's sole parental figure for the vast majority of the child's life, the wait-and-see approach—which was advocated for by the LGAL—would probably have been more prudent. But there is, regrettably, no "pause" button in proceedings involving minor children, nor any way to reverse the hands of clock. See, e.g., *Pierron v Pierron*, 282 Mich App 222, 262; 765 NW2d 345 (2009). Although reasonable minds might disagree with the wisdom of removing RC from petitioner, such disagreement does not render the superintendent's later decision to deny petitioner consent to adopt RC—under changed circumstances—either arbitrary or capricious. See *In re ASF*, 311 Mich App at 436 ("reasonable minds might well question the wisdom of denying petitioners consent to adopt and of removing ASF from the continuity of a stable family setting. . . . But neither this Court nor the circuit court reviews the matter de novo, and it is not for us to say whether the superintendent made the 'correct' decision.").

The majority views this case differently. According to the majority, the trial court made a factual finding "that the superintendent's stated reasons were not genuine reasons" based on evidence that "the superintendent's stated reasons were, essentially, manufactured in support of her premature April 12, 2017 decision." The majority then cites evidence supporting that the superintendent made her decision on April 12, 2017, concluding that the trial court's factual finding that the superintendent's reasons were not genuine was not clearly erroneous.

In my opinion, this approach runs contrary to established caselaw, and adds new and unlawful standards to a trial court's review of the superintendent's decision to withhold consent to adopt. There is no caselaw to support that a trial court can simply refuse to consider the superintendent's reasons for withholding consent to adopt, even if those reasons appeared to be manufactured or not genuine. To the contrary, our caselaw is clear that the trial court's "initial focus" should be "on the reasons given for withholding consent to the adoption." *In re Keast*, 278 Mich App at 425. Our caselaw is also clear for when the superintendent's reasons for withholding consent are arbitrary and capricious: "it is the absence of any good reason to withhold consent . . . that indicates that the representative was acting in an arbitrary and capricious manner." *In re Cotton*, 208 Mich App at 185. See also *In re Keast*, 278 Mich App at 425; *In re ASF*, 311 Mich App at 430. In other words, the trial court's review of whether the superintendent's decision was arbitrary and capricious must focus on the superintendent's *reasons* for denying consent; if there was "a good reason" to withhold consent, then the decision was not arbitrary and capricious. *In re Keast*, 278 Mich App at 425.

Yet, according to the majority, a trial court can *refuse* to consider the superintendent's reasons for withholding consent if the court finds that the reasons are "not genuine." But the trial court is not reviewing the superintendent's underlying motivations for withholding consent; it is supposed to be reviewing the superintendent's reasons themselves. Indeed, the trial court's entire determination of whether the superintendent's decision was arbitrary and capricious *depends* on whether the superintendent gave good—not "genuine"—reasons. So I would hold

that, even if the superintendent appears to have "manufactured" reasons for denying consent to adopt, so long as those reasons are "good" and based on true facts that objectively support the superintendent's decision, then there were good reasons to withhold consent.[5]

This leads to an ancillary, yet more troubling, problem with the majority's holding. If a trial court can refuse to address the superintendent's reasons because it finds the reasons are "not genuine," then the trial court's review of these cases effectively becomes de novo: if a trial court simply disagrees with the superintendent's decision, it can dismiss the superintendent's reasons as "not genuine," conclude that the lack of "genuine" reasons for the superintendent's decision makes the decision arbitrary and capricious, and then reverse.[6] This is in stark contrast to the highly deferential standard that trial courts are supposed to afford the superintendent's decision to deny consent to adopt, see *In re Cotton*, 208 Mich App at 184, and so I cannot agree that a trial court may disregard the superintendent's reasons as "not genuine." Instead, as explained, the trial court must address whether the superintendent gave any good reasons to withhold consent, and if so, the trial court must affirm. See *In re Keast*, 278 Mich App at 425.

---

[5] In a different example, the reason why may be clearer. Assume a petitioner wants to adopt a child and the superintendent sought to "manufacture" reasons to deny the petitioner consent to adopt. In this hypothetical, the superintendent, on her own initiative, orders a medical exam of the child to investigate possible child abuse. The medical exam reveals that the child has been repeatedly abused over several months, and an interview of the child reveals that the petitioner had been abusing him that entire time. In this situation, the superintendent would have an objectively good reason to deny the petitioner consent to adopt. And even if the superintendent admitted to the trial court that she sought to "manufacture" reasons to withhold consent, the trial court would be derelict in its duty if it let a petitioner who repeatedly abused a child to then adopt that child.

I believe that the same reasoning from the example applies here: if the superintendent's reasons for denying petitioner consent to adopt are objectively reasonable, then it does not matter whether the reasons appeared to be "manufactured"; the trial court must still address the reasons and determine whether they are good reasons to withhold consent to adopt.

[6] According to the majority, this conclusion by the trial court would be a factual finding, so this Court's review would be limited to clear error, giving deference to the trial court's determination of the superintendent's credibility. See *Miller-Davis Co v Ahrens Constr, Inc*, 495 Mich 161, 172; 848 NW2d 95 (2014). In other words, for purposes of this Court's review, it would not matter whether the trial court properly applied the law, i.e., whether it determined if the superintendent had any good reason to withhold consent. See *In re Cotton*, 208 Mich App at 185; *In re Keast*, 278 Mich App at 425; *In re ASF*, 311 Mich App at 430. All that would matter was whether there was sufficient evidence—including the trial court's determination that statements of the superintendent were not credible—so that this court was not "left with the definite and firm conviction that" the trial court made "a mistake" by finding that the superintendent's reasons were manufactured. *Miller-Davis Co*, 495 Mich at 172.

In sum, I believe that the trial court misapplied the law; it was required to address the superintendent's reasons for withholding consent to adopt, and it failed to do so. Because I would hold that this failure amounted to clear legal error warranting reversal, I respectfully dissent.


/s/ Colleen A. O'Brien