# STATE OF MICHIGAN

# COURT OF APPEALS

---

MARYANN KATHERINE BRUDER,

        Petitioner-Appellant,

v

DEPARTMENT OF HUMAN SERVICES,

        Respondent-Appellee.

UNPUBLISHED
April 28, 2015


No. 322859
Macomb Circuit Court
Family Division
LC No. 2014-019519-AM

---

Before: RONAYNE KRAUSE, P.J., and K. F. KELLY and SHAPIRO, JJ.

PER CURIAM.

Petitioner Maryann Bruder appeals by right the trial court's denial of her petition to adopt the minor child, JSF, and her motion to determine that the Michigan Children's Institute (MCI) Superintendent's denial of consent to that adoption was arbitrary and capricious. Petitioner is a foster parent with whom JSF was placed during the pendency of termination proceedings against the birth mother; those proceedings ultimately resulted, however, in reunification. The birth mother subsequently proved to have been unable to care for JSF after all, and her rights were ultimately terminated in a second proceeding. Subsequently, JSF was placed with a different foster parent during the second termination proceedings. Petitioner sought to adopt JSF and was denied. She contends that her denial was a result of bias against her stemming from reports she made to the Department of Human Services (DHS) and Children's Protective Services (CPS) to the effect that JSF was being harmed by the birth mother at the contracted adoption agency. DHS allegedly "retaliated" against petitioner and engineered reevaluations of petitioner's foster care license and ultimately caused her to be denied adoption of JSF. The trial court found the superintendent's reasoning for denying her adoption to not be arbitrary and capricious. Petitioner now appeals. We affirm.

The minor child, JSF, was born April 4, 2010, and tested positive for cocaine at that time. JSF was, as noted, placed with petitioner, where she remained for approximately 17 months. It is undisputed that petitioner provided "excellent physical and emotional care" for JSF during that period, but JSF was returned to her birth mother for 11 months until the birth mother was incarcerated for a parole violation. Petitioner apparently had a somewhat argumentative relationship with the birth mother and with case workers. Petitioner, however, contends that she had legitimate and verified concerns about JSF's well-being and denies any impropriety. Several investigations were initiated into petitioner's conduct, and although most of the allegations were found to be unproven, she was found to have engaged in at least some inappropriate conduct.

-1-

Of note, one investigation in particular was commenced because petitioner was alleged to have engaged in a kidnapping scheme. Apparently, JSF was in the care of the birth mother's parents or grandparents at the time, and they received a telephone call from a fictitious person who gave petitioner's telephone number and instructed them to drop JSF off at the police station; meanwhile, petitioner contacted an agency licensing supervisor to report that the grandparents had contacted *her* to tell her that they could not care for JSF. Shortly thereafter, DHS received a call "stating that the grandparents were dropping the child off at the police station because they could not care for her" and "the grandparents had received a call stating that they needed to drop [JSF] off at the police station as the mother had lost her rights and the foster parent was regaining custody." The child was not, in fact, dropped off. Although some telephone numbers were eventually traced back to petitioner, it was never actually established who contacted whom first, or whose version of events was accurate. Despite the suspicious nature of the calls and a police officer's suspicion that petitioner was lying about her lack of involvement, the police did not subpoena petitioner's telephone records, no criminal charges were ultimately filed, and the investigation concluded that it was unable to substantiate involvement by petitioner.

As noted, after JSF was removed from the birth mother the second time, JSF was placed with a foster home referred to by the parties as "Foster Mother L." Petitioner has, throughout the case, maintained that placing the child with anyone but her was improper and even illegal. However, we note that it was established that Macomb DHS made that placement, not any parties relevant to the adoption decision at issue in this matter. As will be repeated, the instant appeal pertains to the adoption decision, which, pursuant to MCL 400.203, MCL 400.209, and MCL 710.45, the adoption decision was made by William Johnson in his role as the superintendent of the Michigan Children's Institute. The child's placement in a foster home other than petitioner's after the child's mother's parental rights were terminated was a decision made by the Macomb County DHS, and, rightly or wrongly, was thus "a done deal," before the child was committed to MCI. The trial court found, and we have no reason to dispute, that "Macomb DHS did not act honorably here." Nonetheless, by the time any parties relevant to the adoption decision at issue in this matter became involved, that placement had already been made. Petitioner's repeated references thereto are, consequently, not properly before us.

Petitioner sent a letter to Johnson expressing her desire to adopt JSF and also extensively chastising DHS for "outrageous negligence" in both returning JSF to her birth mother and in failing to return her to petitioner thereafter. Johnson requested an explanation from Macomb DHS for why JSF had not been placed with petitioner, and he received an explanation that DHS had not done so because of concerns about petitioner's behavior. Johnson instructed Catholic Charities, the organization charged with JSF's adoption, that whatever feelings the Macomb DHS staff might have about petitioner, petitioner was to receive a fair evaluation. The worker at Catholic Charities assigned to the matter was aware of JSF's prior history with petitioner, but also aware that JSF had not been in petitioner's care for a long time. She explained that her goal was to make a recommendation that was in the best interests of the child rather than of any particular interested party. She met with petitioner and discussed the various complaints that had been leveled against petitioner, noting that she did not know whether anything she had received from Macomb DHS was even true.

Despite an overall positive assessment, Catholic Charities recommended that petitioner be denied adoption of JSF because JSF had already formed a strong and highly positive

relationship and bond with the other interested party. Catholic Charities sent petitioner a letter stating that it could not recommend her for adoption because it "believed that [JSF's] adoption by the other party will be in her [the child's] best interest as she has a strong established relationship with this party," but noting that the denial was "not a reflection of [petitioner's] inability to adopt or parent a child" and that "she should be considered for adoption for a child currently or in the near future." Petitioner promptly exercised her right to a denial conference, essentially an appeal seeking review of the denial by the adoption agency's supervisor. The supervisor at Catholic Charities subsequently informed petitioner that some time would be required to review the matter.

The supervisor testified that she was concerned by two items: why, as petitioner asked, JSF had not been returned to her care; and also the fact that petitioner gave the impression of being more concerned about her own feelings than the best interests of the child. Nevertheless, the supervisor was also concerned that Macomb DHS and, to a lesser extent, MCI were trying to pull the case workers "into other people's agenda." She eventually advised Johnson that she was "inclined" to change the recommendation to recommending that petitioner be approved for adopting JSF.

Johnson was also aware that JSF had been with petitioner for a considerable part of the beginning of her life, but also that JSF had not been with petitioner for some 22 months thereafter by the time he became involved, and the best interests of JSF entailed assessing her at the time. In response to being advised of the inclination to change the recommendation, Johnson requested that Catholic Charities meet with Macomb DHS and hear them out. Johnson explained that because of confidentiality rules, certain documents could not have been provided by Macomb DHS, but Macomb DHS could provide information at a meeting. At the subsequent meeting with Macomb DHS, Macomb DHS information that Catholic Charities and Johnson had not previously been aware of, including information about the alleged kidnapping attempt and also certain allegations of harassment.[1] Johnson testified that he found the information "alarming" and "bizarre."

Johnson and the Catholic Charities supervisor decided that there was simply so much conflicting information from clearly biased sources that they needed a neutral third party. To that end, they decided to select a psychologist who they trusted with whom they could share some of the information about the allegations and have the psychologist independently evaluate petitioner and her "ability to take care of a child such as [JSF]." Petitioner was sent a letter explaining that she was required to complete a psychological evaluation, that the supervisor was "in the process of identifying a psychologist to conduct this evaluation," and that she would inform petitioner of the psychologist within a week. Petitioner responded with an inquiry as to why this evaluation was necessary; Johnson followed up by explaining to petitioner that if she had the evaluation she would not be guaranteed adoption approval, but if she declined the

---

[1] As noted, it appears that it was never established whether petitioner actually did engage in a kidnapping scheme or in any harassment. The accuracy of these allegations, however, is not relevant to the outcome of the instant appeal.

evaluation, she would be denied, and furthermore that Johnson required the examination to be completed by a person of his choice. Petitioner was instructed to return a release of information, and she was subsequently sent another letter asking petitioner to clarify whether she intended to comply with the requirement of obtaining a psychological evaluation from the specified psychologist.

It is not disputed that petitioner ultimately did not obtain the specified psychological examination. By the next month, Johnson was no longer considering petitioner an option for JSF's adoption because she failed to obtain the psychological evaluation and also because, although the time JSF spent with petitioner was significant, JSF had had no contact with petitioner for two years since then and had developed a relationship with the new foster parents. Petitioner was sent a letter advising her that because petitioner had not signed the release of information or scheduled an appointment with the chosen psychologist, she would "no longer be considered as a potential adoptive parent for [JSF]." Petitioner did provide a copy of another psychological examination that she had obtained previously of her own initiative from a different psychologist, but Johnson found it strange that petitioner would have obtained a psychological examination on her own and declined to accept it.

Johnson drafted a four-page decision setting forth his reasons for denying adoption of JSF by petitioner. Among other matters, Johnson noted that petitioner had taken excellent care of JSF and JSF had formed a strong and secure attachment to petitioner during that time. He also noted that JSF had not seen or interacted with petitioner in more than 27 months since then and was presently "residing in a very stable environment and is being well cared for" and had "developed a psychological relationship with another foster parent who is a potential adoptive parent." Johnson opined that JSF "would have no cognitive psychological relationship with" petitioner at the time, and it would not be in JSF's best interests at the time to be removed from her current placement and placed with petitioner. Johnson also outlined the "information which casts a high degree of concern about the appropriateness of [petitioner's] conduct as a foster parent and a licensed attorney during the time [JSF] was placed in her [foster home] as well as during the time [JSF] was in the custody of her mother." Johnson noted that petitioner had apparently acted "out of her very strong concern for the safety and well being of the child," but nevertheless acted improperly. Johnson particularly stressed the fact that petitioner had been advised that she "would be required to undergo a psychological evaluation by a specific psychologist" but refused to cooperate. Johnson concluded that it would be in JSF's best interests to be adopted by the other family and not petitioner.

Petitioner commenced the instant litigation shortly thereafter. The trial court concluded that Johnson's decision came down to requiring petitioner to undergo a psychological evaluation and denying her adoption on the basis of petitioner's refusal. The trial court drew the analogy to an attorney making a motion and the judge requesting additional briefing of a party on the grounds that that additional briefing might persuade the court to grant the motion, whereupon the party simply refused to do so. As noted, the trial court opined that "Macomb DHS did not behave honorably here." However, it held that "for [petitioner] to prevail I would have to say that was [sic] unreasonable for Mr. Johnson to make that request," but it concluded that Johnson had been faced with a difficult situation and "did his best to deal with it as neutrally and professionally as he did and the good person who came out on the short end of it was unhappy with the result[, t]hat happens.". This appeal followed.

-4-

"We review the trial court's findings of fact in a bench trial for clear error and conduct a review de novo of the court's conclusions of law." *Chapdelaine v Sochocki*, 247 Mich App 167, 169; 635 NW2d 339 (2001). Pursuant to MCL 710.45, review of the superintendent's decision to deny consent to adopt, referred to as a "Section 45 hearing," is strictly limited to determining whether that decision was arbitrary and capricious. MCL 710.45(2), (7); *In re Keast*, 278 Mich App 415, 423; 750 NW2d 643 (2008). This Court reviews the trial court's application of this standard for clear error. *In re Keast*, 278 Mich App at 423. This Court defers to the trial court's superior vantage point and ability to evaluate the credibility of witnesses who appeared before it, and consequently to any factual findings to the extent they are based on any such credibility assessments. *Shann v Shann*, 293 Mich App 302, 305; 809 NW2d 435 (2011); *Draggoo v Draggoo*, 223 Mich App 415, 429; 566 NW2d 642 (1997). A trial court commits clear legal error when it "incorrectly chooses, interprets, or applies the law," *Shann*, 293 Mich App at 305, and must leave this Court "with a definite and firm conviction that the trial court made a mistake." *People v Armstrong*, 490 Mich 281, 289; 806 NW2d 676 (2011). The trial court's decision whether to admit evidence is reviewed for an abuse of discretion, but preliminary legal determinations of admissibility are reviewed de novo. *People v Gursky*, 486 Mich 596, 606; 786 NW2d 579 (2010). However, this Court will only reverse on the basis of evidentiary errors if they affected a party's substantial rights. MCR 2.613(A); MRE 102(a); *In re Caldwell*, 228 Mich App 116, 123; 576 NW2d 724 (1998). Unpreserved claims of error are reviewed for plain error affecting substantial rights. *In re TK*, 306 Mich App 698, 703; ___ NW2d ___ (2014).

A "Section 45" review, pursuant to MCL 710.45, of the MCI Superintendent's decision to deny adoption to a petitioner is reviewed not for correctness or for whether the reviewing court would have arrived at a different decision, but rather for whether clear and convincing evidence has been presented establishing that the decision was arbitrary and capricious. *In re Cotton*, 208 Mich App 180, 183-185; 526 NW2d 601 (1994). The "clear and convincing" standard is the most demanding civil evidentiary standard; it need not be uncontroverted, but it must cause the trier of fact to have little if any doubt as to the truth of the assertion at issue. *In re Martin*, 450 Mich 204, 226-227; 538 NW2d 399 (1995), cert den 516 US 1113; 116 S Ct 912; 133 L Ed 2d 843 (1996). "Arbitrary" and "capricious" mean, essentially, unprincipled or baseless and arbitrary or whimsical. *Bundo v City of Walled Lake*, 395 Mich 679, 703 n 17; 238 NW2d 154 (1976).

Petitioner correctly points out that this review may *not* simply be a "rubber stamp," but rather necessitates an actual analysis of actual evidence. *In re CW*, unpublished opinion per curiam of the Court of Appeals, issued February 16, 2010, (Docket No. 292866) slip op at dissent p 3 (SHAPIRO, J, dissenting), cited as the basis for reversing by our Supreme Court 488 Mich 935; 790 NW2d 383 (2010). However, at issue in *In re CW* was the admission and consideration of evidence at all. *Id.*; see also *In re CW*, 488 Mich at 936 ("On remand, the circuit court shall allow the petitioners to present relevant evidence in support of their claim that the Michigan Children's Institute Superintendent's decision to withhold consent to adopt the minor children was arbitrary and capricious. MCL 710.45(2). After admitting and considering this evidence, the circuit court shall determine whether the petitioners have established by clear and convincing evidence that the Superintendent's decision was arbitrary and capricious"). In the instant matter, the trial court admitted a vast amount of evidence and clearly erred on the side of admitting, rather than excluding, evidence from both parties; furthermore, the trial court agreed with petitioner that if, as petitioner asserted, "there's no evidence or proof to anything in

which [Johnson] rested his opinion on," then "he loses." The trial court does not appear to have "rubber stamped" Johnson's decision.

Petitioner asserts an array of miscellaneous other challenges to the trial court's handling of this matter, most of which are irrelevant or confusing, almost all of which appear to arrive at some manner of bootstrapping to the effect that the trial court and Johnson *must* have committed errors for them to have found against her. We do find the trial court's opinion from the bench to be a bit difficult to follow in places, but it is crystal-clear from reading the transcript as a whole that the trial court was scrupulously even-handed in admitting evidence and dealing with objections: the trial court obviously did not want to play the role of an ersatz parent to the parties' bickering,[2] and instead adopted the approach of admitting almost everything from *both* parties and admonishing them to "just ask your questions." While this style of trial management may be somewhat unorthodox, we find it appropriate under the circumstances.

Petitioner complains of the trial court's *laisses faire* approach to evidentiary challenges, but we note that petitioner explicitly conceded at the beginning of the hearing that she had no real problem with it so long as she was given an equal opportunity to present evidence. She obviously was given that opportunity. Although the Rules of Evidence do generally apply to adoption proceedings pursuant to MCR 3.800(A), unless the admission of some evidence impaired a party's substantial rights, no error in doing so can result in this Court reversing the trial court. MCR 2.613(A); MRE 102(a); *In re Caldwell*, 228 Mich App at 123. Petitioner fails to back up her assertions that the trial court failed to apply the Rules of Evidence with any coherent articulation of her reasoning. Petitioner objected to the trial court taking judicial notice of the CPS proceeding files, but the trial court indicated that it was "probably not going to review" it and truly only cared about actual testimony. Otherwise, petitioner mostly seems to object to Johnson having had access to certain confidential reports that could not be legally disclosed without a court order that, after an in camera interview, the trial court granted; the records were in fact served on petitioner. It escapes us how petitioner could have been prejudiced, no matter how many times petitioner reiterates that conclusion.

Petitioner takes exception to a remark the trial court made to the effect that it did not care whether this Court reversed it, but in context that remark was merely an admirably professional dedication to not taking matters personally and desiring not to play games or skirt issues. The length of time the trial court required to render a final decision is likewise perfectly in order: pursuant to MCL 710.45(6), the trial court was required to render a decision within 91 days of petitioner's petition "unless good cause is shown," and in light of the massive presentation petitioner launched, good cause was clearly shown. In any event, even if no "good cause" has been shown, petitioner does not articulate how any such violation constitutes an error mandating reversal, particularly where the only obvious "penalty for delay would be more delay." See *In re TC*, 251 Mich App 368, 370-371; 650 NW2d 698 (2002). Petitioner asserts that the trial court was biased against her, apparently because she finds it suspicious that the trial court was aware

---

[2] At one point, the trial court *literally* told the parties to "deal with each other in the hallway," explaining that "I just want to get the job done."

that her prior employment with the prosecutor's office ended with hard feelings, but she herself raised the issue at the outset of the proceedings and explicitly stated that the trial court's knowledge thereof was not a problem.

Petitioner's complaints that the courtroom was inadequately closed are unsupported by any citation to any law that we can discern; her reference to the Child Abuse Prevention and Treatment Act, 42 USC Chapter 67 is unhelpful, because that is a 110 page document within which the word "closed" appears nowhere. Pursuant to MCL 710.67, to which petitioner does *not* cite, adoption records must be kept confidential, but that has no bearing on whether petitioner received a fair hearing. In any event, although the record does reveal several instances of nonparticipants apparently wandering into the courtroom, the trial court consistently directed them to leave except for one instance when the trial court explained to the parties that the visitors were just passing through and uninterested in the proceedings.

It appears to us that the trial court was fair and even-handed with petitioner, and indeed displayed remarkable patience with the parties. Perhaps the trial court's bench opinion could have been articulated somewhat more concisely, but its expressed views were reasonable, not the reckless disregard alleged by petitioner. Ultimately, the trial court evaluated the credibility of the witnesses and found that Johnson had been credible and that he made a decision calculated to resolve the conflicting evidence before him, and petitioner refused to cooperate; on that basis, Johnson reasonably treated that noncompliance as resolving the matter.

The gravamen of petitioner's claim, below and here, appears to be that there exists what appears to be a conspiracy against her within DHS. Initially, we note that although this is a somewhat extraordinary claim, we do not feel it rises to the level of a "fantastic or delusional scenario" of the sort that could justify a sua sponte dismissal for frivolity in a federal court. See *Neitke v Williams*, 490 US 319, 328; 109 S Ct 1827; 104 L Ed 2d 338 (1989). It is undisputed that there were hard feelings between petitioner and Macomb DHS, a fact of which Johnson and Catholic Charities were aware. Furthermore, such a conspiracy is not, strictly speaking, impossible: even though paranoid beliefs are frustratingly immune to facts, people suffering from paranoia are not immune from acquiring genuine enemies. However, everyday experience strongly suggests that very few people have the spare time and energy to participate in the prosecution of multi-level and interdepartmental coordinated bureaucratic vengeance. Petitioner simply does not make out a persuasive case for Johnson or anyone at the adoption agency having any kind of axe to grind with her or acting out of motives other than a concern for JSF's well-being.

According to petitioner, Johnson "interfered" with the adoption agency's decision, notwithstanding the fact that the superintendent is actually the ultimate decision maker. MCL 400.203, MCL 400.209, MCL 710.43; MCL 710.45. Indeed, it was established that Johnson was in no way obligated to follow the agency's recommendation, whatever that recommendation might be. Johnson stated that he found the material received from Macomb DHS to be *concerning*, not dispositive, and that in fact he did not know whether any of it was true. Petitioner takes out of context Johnson's statement that his decision was ultimately based on that additional information. Johnson testified that he also relied on correspondence and conversations with petitioner and with other staff. More importantly, Johnson made it abundantly clear that the Macomb DHS and MCI information did not directly lead him to deny

-7-

petitioner for adoption, but rather caused him to come to the conclusion that a neutral and trusted third party with expertise in psychology was necessary to resolve his concerns. Johnson explained to petitioner that he was concerned about some of her behaviors and that the consequence of not undergoing the psychological examination would be denial.

In other words, the materials Johnson received from Macomb DHS and MCI did ultimately lead to her denial, but only indirectly. Those materials caused Johnson to seek to resolve an apparent factual ambiguity, and petitioner's denial was proximately caused by her refusal to participate in Johnson's selected vehicle for achieving that resolution. Petitioner strenuously objects to the absence of any explanation at the time as to precisely what behaviors Johnson found concerning, but fails to explain how that excuses in any way her failure to comply with Johnson's requirement. Petitioner also extensively details alleged errors in materials available to Johnson, but again, Johnson indicated that he was unsure they were accurate and sought the psychological examination as a way to "cut through the noise." Put more simply, it is readily apparent, and indeed inescapable, that petitioner *disqualified herself* from eligibility to adopt JSF by refusing to cooperate with Johnson's attempt to find an explanation for the anomalous information Johnson had received from Macomb DHS.

Petitioner's conclusion that she was the target of a revenge-driven conspiracy only makes logical sense if one has already concluded that a witch-hunt is the only plausible explanation for the denial. Ultimately, the issue on the "Section 45 review" is whether Johnson's decision to deny petitioner for adoption was clearly and convincingly arbitrary and capricious on the basis of Johnson's decision *in context*, not in the abstract. Johnson's decision to take Macomb DHS seriously enough to seek further information about and clarification of the information it provided does not, *ipso facto*, mean that Johnson swallowed the story whole, irrespective of whether Macomb DHS's information was correct. It would have been irresponsible for Johnson to either accept Macomb DHS's information at face value *or* reject it out of hand. Importantly, the trial court explicitly found Johnson to be credible, honest, straightforward witness, an analysis that this Court cannot contest. Johnson's decision was partially based on JSF's lack of contact with petitioner for an extended period of time, JSF's present well-being and connection with the eventual adoptive parents, *and* petitioner's refusal to participate in a process to clarify the concerning information Johnson had received. That decision is neither arbitrary nor baseless, and it is neither random nor whimsical.

We do not doubt the sincerity of petitioner's feelings in this matter. Indeed, we recognize that being denied adoption of a child with whom one feels a bond and for whom one had already provided extensive care is traumatic. However, she appears to draw the conclusion that the only possible reason for such an adverse decision must be malicious malfeasance by others, which the evidence fails to support. Petitioner correctly points out that the applicable standard of review is not absolutely deferential, but we will not reverse the trial court in the absence of at least some substance that petitioner has simply not demonstrated. The trial court is affirmed.

/s/ Amy Ronayne Krause
/s/ Kirsten Frank Kelly
/s/ Douglas B. Shapiro