# STATE OF MICHIGAN

# COURT OF APPEALS

---

*In re* RC, Minor.

---

LUCINDA CARRIER,

      Petitioner-Appellee,

v

MICHIGAN CHILDREN'S INSTITUTE,

      Respondent-Appellant.

UNPUBLISHED
January 3, 2019

No. 343736
Wayne Circuit Court
Family Division
LC Nos. 17-000510-AO
           14-518511-NA

---

Before: M. J. KELLY, P.J., and METER and O'BRIEN, JJ.

PER CURIAM.

Petitioner, Lucinda Carrier, the paternal aunt of the minor child RC, sought consent to adopt RC after the parental rights of RC's biological parents were voluntarily released. The superintendent of the Michigan Children's Institute (MCI) withheld consent to adopt.[1] Carrier challenged the denial of consent to adopt in the circuit court. After conducting a hearing pursuant to MCL 710.45(2) (Section 45 hearing), the circuit court found that the superintendent's decision to deny consent was arbitrary and capricious. The MCI appeals that decision as of right.

---

[1] "The MCI superintendent represents the state of Michigan as guardian of all children committed to the state by a family court after termination of parental rights." *In re Keast*, 278 Mich App 415, 423; 750 NW2d 643 (2008). See also MCL 400.203. The MCI superintendent is authorized to consent to the adoption of any child committed to its care. MCL 400.209. Indeed, "[c]onsent by the superintendent to the adoption of a state ward is required before the family court can approve a prospective adoption." *Keast*, 278 Mich App at 423. Under MCL 710.45(2), a person who has filed a petition to adopt a state ward and has not received consent from the MCI superintendent may file a motion with the court to challenge the denial. *In re ASF*, 311 Mich App 420, 427; 876 NW2d 253 (2015). Specifically, MCL 710.45(2) provides that "[i]f an adoption petitioner has been unable to obtain the consent required by [MCL 710.43(1)(b)], the petitioner may file a motion with the court alleging that the decision to withhold consent was arbitrary and capricious."

Because the trial court did not clearly err by concluding that Carrier had presented clear and convincing evidence demonstrating that the superintendent's decision was arbitrary and capricious, we affirm.

## I. BASIC FACTS

RC was born in July 2014. Approximately five months later she was removed from her parents' care following allegations that her birth parents were physically abusing her. RC was placed with Carrier, and, in January 2015, a petition to terminate RC's biological parents' parental rights was filed. RC's biological parents voluntarily relinquished their rights, and RC was committed to the MCI for adoption planning. She remained in the care of Carrier who obtained a foster care license. In February 2017, Carrier requested consent to adopt RC. Fostering Futures, the adoption agency responsible for RC, submitted Carrier's request to the MCI. Fostering Futures' initial recommendation was that Carrier be granted consent to adopt. Although RC was a ward of the MCI, the MCI superintendent did not have any personal involvement in her case until March 2017. The superintendent testified that until that point "there was nothing of any concern noted" in Fostering Futures' recommendation that Carrier be allowed to adopt and there was "absolutely" no reason to deny consent.

However, on March 20, 2017, RC (who was just under three years old) was discovered unsupervised outside her paternal grandfather's home with another toddler. The children were wholly unsupervised and were inadequately dressed for March weather in Michigan. The record reflects that Carrier left RC at RC's parental grandfather's home while she ran some errands. Also present in the home was RC's biological father and several other adults. Although Carrier asserts that she left the child in the child's grandfather's care, the superintendent noted that there were conflicting statements as to who was actually supposed to be watching RC when she and the other toddler got out of the house. Because of the incident, Fostering Futures withdrew its recommendation so that Child Protective Services (CPS) and the foster-care licensing agency could complete their investigations. Additionally, two safety plans were put in place to ensure RC's continuing safety. It is undisputed that Carrier followed the safety plans.

The superintendent testified that she participated in two phone conferences: one on March 24, 2017 and the second on March 30, 2017. During the conversations, she discussed the preliminary findings of the investigations, the likelihood that CPS would substantiate neglect, RC's safety, and whether to remove RC from Carrier's home. She testified that she was told that Carrier would be substantiated for neglect and placed on the Central Registry for Child Abuse.

Subsequently, on April 10, 2017, at a Family Team Meeting (FTM), Carrier was advised that RC was going to be removed from her care.[2] Tabitha Hallett, the case worker from Fostering Futures, testified that at that point Fostering Futures started looking for new families for RC. Prior to the meeting, Carrier testified that she was also advised that the superintendent

---

[2] It should be noted that RC's guardian ad litem (GAL) did not recommend removal because there were safety plans already in place and she was concerned about inflicting unnecessary trauma on RC.

would be denying her consent to adopt, that RC would be removed from her care, and that a new family had been found for her. The superintendent testified that it was "true" that before the FTM she advised Fostering Futures that she was not "considering [Carrier] for adoption." The removal was scheduled for April 27, 2017. The superintendent testified that the slow removal was because Fostering Futures did not feel that RC was at "imminent risk" of harm.

Carrier protested the removal. The superintendent testified that if a petitioner challenges a removal, the appeal is before the Foster Care Review Board. If the Foster Care Review Board agrees with the petitioner that the removal is improper, the matter is submitted to the MCI superintendent for a final decision on whether the child should or should not be removed. In this case, on April 12, 2017, the Foster Care Review Board sent the superintendent the following e-mail:

> I received a request for a foster parent appeal from Ms. Lucinda Carrier, regarding [RC]. In speaking with the caseworker Ms. Hallett, I was advised that you had requested that they move the child to another home and that consent to adopt would be denied. If consent will be denied, would you be able to send me a reply stating that? We won't do an appeal if those are the facts.

Approximately one and a half hours later, the superintendent replied:

> There was a case conference with Maltreatment in Care and they are likely going to substantiate and place Lucinda Carrier on Central Registry. I cannot consent to her adopting [RC] unless I make an exception, which is rarely done and must be based on the merits of the case.
>
> Lucinda left [RC] with the birth father and her own invalid father. The birth father's girlfriend left to be drug-screened and [RC] walked out the door with the woman's 4 year old child. No one was attending the children. They was [sic] gone for more than twenty minutes, found in the street with no shoes or socks in March. They could have been killed or kidnapped. Then Lucinda lied about it. It is [sic] appears that Lucinda, 26, is not ready to be a responsible parent. I cannot make an exception under these circumstances and *will be denying her consent to adopt* [RC]. [Emphasis added.]

At the Section 45 hearing, the superintendent testified that she had not actually made a decision on whether she was going to deny consent to adopt, and she acknowledged that at that point she had not done any independent investigation nor had she spoken or otherwise communicated with Carrier. The superintendent added that she regretted sending the e-mail, and testified that "it was premature for [her] to make that statement." She testified that "it usually takes us three months to determine everything." She added that lots of documentation needed to be considered before a decision could be reached, including what the child's needs are and how the child is doing in her placement.

Because of the superintendent's e-mail, Carrier was not initially given an appeal before the Foster Care Review Board. The Board explained that it:

> denied the appeal, as we received a memo from the MCI Superintendent, Mary Rossman which advised that she was denying Ms. Carrier consent to adopt [RC]. Since consent was denied and the replacement was to an identified pre-adoptive home, it was agreed upon by the MCI Superintendent and the [Foster Care Review Board] that Ms. Carrier's recourse would now fall under the adoption code rather than the statute regarding foster placement moves.

On April 27, 2017, Carrier was placed on the Central Registry. On May 3, 2017, she was found to be in violation of her foster-care-licensing requirements. Notably, both of these reports were submitted weeks after the superintendent's stated to Fostering Futures and the Foster Care Review Board that she would be denying consent.

Carrier retained a lawyer to challenge the removal decision. On April 27, 2017, the day RC was to be removed, the circuit court entered an order staying the removal. A hearing was scheduled for May 11, 2017 to determine whether to lift the stay or continue it and order a Foster Care Review Board review of the removal. Before the hearing, Fostering Futures, the Department of Health and Human Services (DHHS), and an MCI consultant held a phone conference. In a report authored by Hallett, the conversation is summarized as follows:

> It is MCI's position that MCI has *verbally given a denial* and that [the Foster Care Review Board] will not hear the case. Placement for [RC] is determined by MCI. All are in agreement that the child should be moved following the hearing on 5/11/17. [Emphasis added.]

Following the May 11, 2017 hearing, however, the circuit court entered an order continuing the stay and ordering the Foster Care Review Board to review the removal plan.

One day later, on May 12, 2017, an MCI consultant, Carita Fox, sent the following e-mail to Hallett, the case worker from Fostering Futures. The e-mail stated:

> Is there any possible way you would be able to complete the adoption denial request and route to me prior to [the superintendent's] return so that she can make a decision *prior to the next hearing or shortly after that*? [Emphasis added.]

Hallett responded:

> [The Department of Health and Human Services] requested an additional licensing investigation be opened after the previous motion on 4/27. I certainly have enough to write my denial now, but wasn't sure if I should wait for this second investigation be conpleted [sic].
>
> Let me know which you prefer and I certainly can do either.

-4-

The case services plan report summarized the above contact as follows:

> Emailed licensing special evaluation to Ms. Fox per her request. Ms. Fox also requested that a denial DHS 612 be completed and denial consent be routed as soon as possible to ensure that *a formal denial* can be made by MCI prior to the hearing scheduled for 6/8/17. [Emphasis added.][3]

At the Section 45 hearing, Hallett agreed with Carrier's lawyer that the documents essentially provided that after RC was not removed on May 11, 2017, "the very next day there's communications back and forth, do the denial, hurry up and do the denial, we need to do a formal denial before the next court hearing." Hallett also agreed that once MCI decides where the child will go, Fostering Futures just follows its "marching orders." She also added, however, that no one from the MCI told her to submit a denial and she was, in fact, going to recommend denial herself.

On May 22, 2017—before the next court hearing on the removal—Hallett sent a recommendation to deny Carrier consent to adopt. Thereafter, on May 23, 2017, the Foster Care Review Board issued a report stating that it agreed with the removal decision.[4] Relevant to this appeal, the Foster Care Review Board stated in its finding that "Fostering Futures advised that they planned to replace [RC] from the care of her paternal aunt, Lucinda Carrier to an identified pre-adoptive home subsequent to receiving notice from the MCI Superintendent, Mary Rossman, that she was denying consent for Ms. Carrier to adopt [RC]." The Board also stated that it had been recently informed by "Carita Fox from the MCI Superintendent's office . . . that a decision has been made to deny consent for Lucinda Carrier to adopt [RC], and that decision will be finalized and communicated to Fostering Futures and Ms. Carrier upon the MCI Superintendent, Mary Rossman's return to the office in early June 2017."

On June 9, 2017, RC was removed from Carrier's care and placed with a pre-adoptive foster family. Carrier was allowed four visits with RC, but during each visit the new foster parents were present. On June 16, 2017, Hallett arranged a Skype visit between RC and Carrier. It was reported that RC was reluctant to talk at first, but then showed Carrier all the new things in her foster home and told Carrier that she missed her. Hallett testified that RC was "very upset" but eventually calmed down. She reported her observations to the superintendent, and the superintendent recommended that the next visit be observed by someone not familiar with the case.

---

[3] Hallett testified that redacted copies of the reports were provided to Carrier. She also agreed that although Carrier was CC'd on some of the e-mails, when it was noticed that she was being included it was determined that she needed to be taken off the e-mail chain.

[4] Hallett testified that at the time of the Foster Board Review hearing, she knew that the superintendent was denying consent to adopt because that was "what had been stated."

The superintendent testified that at that point in time she was aware that there would be a Section 45 hearing and she "figured there would be some credibility issues and so [she] wanted to make sure that there was, whoever was observing was objective." She denied, however, that she was plotting everything out based on the fact that she had "a Section 45 hanging over me." In any event, the second visit occurred on July 10, 2017 at the agency and was an in-person visit. The caseworker testified that RC "seemed a little nervous at first and was clinging to her foster mother," but she eventually warmed up and began playing with Carrier's boyfriend. She also stated that when Carrier requested a hug, RC had a "meltdown," cried, and went to her foster father for consoling. The worker opined that the agency where the transition originally took place might trigger RC's memories of her removal from Carrier. She also noted that RC seemed secure around her foster parents.

On July 28, 2017, another visit took place, this time at a park. Hallett observed the visit and she testified that RC warmed up quicker and played with Carrier and Carrier's boyfriend, but that she would return to her foster parents. She also stated that RC hesitated to hug Carrier, but was able to give a group hug when held by her foster mother.

Because of RC's response in the prior visits, the superintendent opted to personally observe the final visit, which took place on August 29, 2017 at a library. The superintendent stated that RC stayed at her foster parents' side during the visit and clung to them. She stated that, at the foster parent's encouragement, RC eventually began to engage Carrier and that she allowed Carrier to hug her at the end of the visit without showing signs of distress. Overall, the superintendent testified that RC's behavior during the visits was alarming given that she had been in Carrier's care for most of her life.

On September 7, 2017, the superintendent officially denied Carrier consent to adopt. She based her decision on a number of factors, including RC's reaction to the separation and Carrier's perceived lack of honesty and credibility based on her response to the investigation and her failure to previously report changes in daycare. She referenced the fact that Carrier had been substantiated for neglect and placed on the Central Registry and the fact that her foster-care license was revoked because of several licensing violations. At the Section 45 hearing, she testified that the primary reason was her concerns about how RC reacted after the removal.

Carrier appealed the decision to the circuit court under MCL 710.45(2). Following a lengthy five-day hearing, the court found that the decision to deny consent to adopt was arbitrary and capricious.

This appeal follows.

## II. DENIAL OF CONSENT TO ADOPT

### A. STANDARD OF REVIEW

The MCI contends that the trial court misapplied the standard of review when it reversed the superintendent's decision to deny consent to adopt. Specifically, the MCI contends that the trial court erred by ignoring relevant evidence supporting that the superintendent had good reasons to deny consent when she issued her decision. It also asserts that the trial court improperly substituted its judgment for the superintendent's judgment. "Pursuant to MCL

710.45, a family court's review of the superintendent's decision to withhold consent to adopt a state ward is limited to determining whether the adoption petitioner has established clear and convincing evidence that the MCI superintendent's withholding of consent was arbitrary and capricious." *In re Keast*, 278 Mich App 415, 423; 750 NW2d 643 (2008). Whether the circuit court properly applied this standard is a question of law, which this Court reviews for clear legal error. *Id*.; see also *In re ASF*, 311 Mich App 420, 426; 876 NW2d 253 (2015). "When a court incorrectly chooses, interprets, or applies the law, it commits legal error that the appellate court is bound to correct." *Fletcher v Fletcher*, 447 Mich 871, 881; 526 NW2d 889 (1994). Additionally, a trial court's factual findings are reviewed for clear error, "giving particular deference to the trial court's superior position to determine witness credibility." *Miller-Davis Co v Ahrens Constr, Inc*, 495 Mich 161, 172; 848 NW2d 95 (2014). "A factual finding is clearly erroneous if there is no substantial evidence to sustain it or if, although there is some evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed." *Id*. at 172-173.

## B. ANALYSIS

Whether the superintendent acted arbitrarily and capriciously is the "initial focus" of a Section 45 hearing. *In re Cotton*, 208 Mich App 180, 185; 526 NW2d 601 (1994). When reviewing the superintendent's decision, the focus of the circuit court "is not whether the representative made the 'correct' decision or whether the [court] would have decided the issue differently than the representative, but whether the representative acted arbitrarily and capriciously in making the decision." *Id*. at 184. The reviewing court must focus on the "reasons given by the representative for withholding the consent to the adoption," and "it is the absence of any good reason to withhold consent, not the presence of good reasons to grant it, that indicates that the representative was acting in an arbitrary and capricious manner." *Id*. at 185. As this Court has explained, " '[i]f there exist good reasons why consent should be granted and good reasons why consent should be withheld, it cannot be said that the representative acted arbitrarily and capriciously in withholding that consent even though another individual . . . might have decided the matter in favor of the petitioner.' " *In re ASF*, 311 Mich App 420, 436; 876 NW2d 253 (2015), quoting *In re Cotton*, 208 Mich App at 185 (second alteration in original).

The generally accepted meaning of "arbitrary" is "determined by whim or caprice," or "[f]ixed or arrived at through an exercise of will or by caprice, without consideration or adjustment with reference to principles, circumstances, or significance, . . . decisive but unreasoned." *Goolsby v Detroit*, 419 Mich 651, 678; 358 NW2d 856 (1984) (quotation marks and citations omitted). The generally accepted meaning of "capricious" is "[a]pt to change suddenly; freakish; whimsical; humorsome." *Id*. (quotation marks and citations). Further, under some circumstances, arbitrariness may be evident in proof that an act was undertaken " 'in a perfunctory fashion' " or on the basis of ignorance of facts directly bearing on the matter. *Id*. at 669, quoting *Milstead v International Brotherhood of Teamsters, Local Union No 957*, 580 F2d 232, 235 (CA 6, 1978).

Here, the superintendent gave numerous reasons to support her September 7, 2017 denial of consent for Carrier to adopt RC. At the outset, the trial court found that much of the information that the superintendent relied upon as a basis for her denial of consent to adopt was

based on false and misleading information and that she was or should have been aware that the information was not accurate.[5]  More importantly, the trial court found:

> On April 12, 2017, [the superintendent] issued an email to Jacqueline Poindexter of the Foster Care Review Board *in which she stated she "will be denying her (Ms. Carrier's) consent to adopt [RC.]"*  This unequivocal statement was made before any complete review of the circumstances was done and before Ms. Carrier had an opportunity to respond to all the faulty claims that had been made regarding her.  As can be seen in the discussion herein various claims regarding Ms. Carrier and her actions which were used to establish her as a careless and irresponsible caregiver who could not be trusted to keep [RC] safe were flat out wrong.

> And yet denial of consent was [the superintendent's] position, and once she reached this conclusion her actions appear to be more of an effort to muster

---

[5] On appeal, the MCI argues that the court's "findings" that the facts the MCI relied upon were false or misleading amounts to a substitution of the trial court's judgment for that of the superintendent.  Such a substitution of judgment is improper.  *Cotton*, 208 Mich App at 184.  Yet, the court is nevertheless tasked with determining whether there is a factual basis for the superintendent's decision.  See *id*. at 185 (suggesting that a reviewing court can review whether allegations are frivolous, fanciful, or without "factual support" when determining if the superintendent's decision to withhold consent is arbitrary and capricious).  See also *In re CW*, 488 Mich 935, 940-941 (2010 (CORRIGAN, J., concurring) ("*In re Cotton* did not establish . . . that the Superintendent's decision must be affirmed as long as it appears facially reasoned, without regard to the accuracy of the facts or the thoroughness of the investigation, as long as a single 'good' reason supports the decision.  To the contrary, as *In re Cotton* explicitly suggested, a reviewing court may address whether the bases for his decision are 'without factual support.' ").  Thus, if the superintendent's decision is based on false and misleading information that the superintendent knew was false or misleading, then, arguably, the decision of the superintendent was arbitrary and capricious.  We need not resolve this matter, however, as the trial court found that the superintendent made her decision to deny on April 12, 2017, repeated that decision multiple times, and then, after having made her decision, marshalled evidence in support of it.  On appeal, the MCI dismisses the above findings by contending that the trial court should have credited the superintendent's explanation for the April 12, 2017 e-mail.  However, the court was free to weigh the superintendent's credibility and was not, in fact, required to believe her.

Additionally, the MCI seemingly suggests that the April 12, 2017 e-mail was proper because it was communicated to the Foster Care Review Board, not Carrier, and because Carrier was permitted to submit information thereafter.  However, neither fact is relevant.  MCL 710.45(2) does not immunize an arbitrary and capricious decision simply because it was not communicated to the individual seeking to adopt or because that individual was invited to submit information after the decision had already been made.

support for this decision than to fairly evaluate Ms. Carrier's request for consent to adopt. [The superintendent's] did testify that she assured this court in June that she hadn't made a decision but her statement to the Foster Care Review Board was clear. At the section 45 hearing [the superintendent] attempted to distance herself from this statement saying it was "premature" but by that time she had concluded that Ms. Carrier lied about the March 20th incident because the police report it [sic] said she knew the father was in the home and then she subsequently denied he was there. . . .

\* \* \*

The evidence is clear about [the superintendent's] position on April 12, 2017, as can be seen in the full discussion herein. . . .

\* \* \*

[The superintendent] testified that she didn't deny on April 12, 2017 when she issued her email stating that she will be denying consent. She stated she "didn't intend it to be a final decision." However, at this point, she had already approved a removal of [RC] from Ms. Carrier's home in spite of the fact that Ms. Carrier was reported to be in 100% compliance with the safety plan and there was no evidence of any further risk to [RC]. In light of the compliance with the safety plan by Ms. Carrier, one has to ask why would [the superintendent] have [RC] removed **unless** she was denying consent. At one point in her testimony, [the superintendent] stated that "removal was a foster care decision." However, she later indicated that she agreed to the removal, despite the fact that there were no violations regarding the safety plan.

Inasmuch as there was no risk of harm reported regarding [RC], the only reason for removal would be that [the superintendent] was going to do exactly what she said she was going to do in her April 12th email that is that she would deny consent to Ms. Carrier. [The superintendent] admitted that she had received an email from Ms. Hallett, the foster care and adoption worker confirming the compliance with the safety plan, however, she said the staff was "worried about the child's safety." Ms. Hallett, the foster care worker testified that on May 22, 2017, when Fostering Futures issued its recommendation to deny consent, that she "knew [the superintendent] would deny" the consent for Ms. Carrier. [Emphasis in original.]

In other words, the trial court found that the superintendent made the decision to deny consent on April 12, 2017, and that, after that point in time, her actions were taken to support that decision. For example, the court found that the superintendent opted to use the failure to report a change in daycare against Carrier despite the fact that the adoption agency had been aware of irregularities with the daycare prior to March 20, 2017 and had not given Carrier any indication that she was violating the terms of her foster care license. The court also found it significant that the superintendent opted to judge Carrier's bond with RC only *after* the removal that she had ordered. The court noted that the superintendent "testified that she knew that when

she denied Ms. Carrier consent to adopt her decision would be contested in court" and "[h]er choice to observe Ms. Carrier and [RC] only *after* she had decided she was going to deny consent to Ms. Carrier and well after she had ordered [RC] removed appears to be more of an attempt to justify the hasty decision she made than a straightforward attempt to evaluate the bond." Additionally, the court found that RC's reaction during the post-removal visits was not the main reason for the denial given that it was stated as a reason for the denial "four months *after* [the superintendent] had already stated in writing numerous times that she would deny Ms. Carrier consent." The court found that the bonding-reason was not a genuine reason to deny consent to adopt and was instead "an 11th hour attempt to justify a hasty and arbitrary decision for removal."

As further support for its finding that the April 12, 2017 e-mail reflected the superintendent's denial decision, the court noted that during the section 45 hearing, "every time [the superintendent] was confronted by the fact that something she stated in her emails or her denial to adopt was either wholly untrue or unsupported by the evidence she said that she didn't rely on it "too heavily" or she didn't hold it against Ms. Carrier." The court added:

> In her email [the superintendent] claimed Ms. Carrier was unfazed by the March incident but she didn't use it against her. In her denial to adopt she noted that there were Facebook photos of [RC] with her birth parents whose rights had been terminated, suggesting that this was inappropriate contact that showed Ms. Carrier was an irresponsible caregiver. However, when confronted with the fact that supervised contact had been approved, and she had the reports to prove it, she said she didn't rely on the Facebook photos "too heavily." Yet her denial wholly ignores the fact that supervised contact had been approved and her denial refers to contact between [RC] and her father as "prohibited contact." Then there was the issue of Ms. Carrier not reporting her full time employment to the Fostering Futures agency. This was proven to be false based on the pay stubs [Carrier's lawyer] provided to [the superintendent]. But unfortunately [the superintendent] had already committed herself to denial and removal by the time [the lawyer] even knew this was an issue and had an opportunity to expose it as false. Then there was the alleged failure to report a change in day care which Ms. Carrier actually did report though it may have been six or so weeks later.
>
> In her denial to adopt [the superintendent] said Ms. Carrier was on Central Registry but this was only because she had a "license" which held her to a higher standard. The Central Registry was being contested by Ms. Carrier and [the superintendent] admitted even if Ms. Carrier wasn't successful in her Central Registry appeal it was not a barrier to adoption.
>
> In addition [the superintendent] said [RC] had to be removed to maintain her safety, yet when the March 20 incident occurred there was *no immediate removal request*. And it was not until *after* the March 20th incident that for the very first time there was a safety plan and a direction that [RC] was not to be around her father. Ms. Hallett, the foster care worker, testified that there was no immediate risk of harm and no violation of the safety plan put in place after the incident. [RC] wasn't removed to maintain her safety, she was removed, and

traumatized, for one simple reason—[the superintendent] had decided to deny consent to Ms. Carrier. What possible reason could there be for removal unless [the superintendent] was committed to the denial of consent for Ms. Carrier to adopt? [Emphasis in original.]

Again, the trial court found that the decision to deny consent was made on April 12, 2017. The court found that the superintendent then knowingly relied on information she knew was false or misleading in order to justify her decision to deny consent. It also found that the superintendent's reliance on the outcome from the visits between RC and Carrier was not the true reason for the denial, *as the decision* had already been made. The court's finding did not amount to a substitution of its judgment for that of the superintendent. Rather, the court found that the superintendent's stated reasons were, essentially, manufactured in support of her premature April 12, 2017 decision. The court is permitted to find that the superintendent's stated reasons were not genuine reasons. See *Miller-Davis Co*, 495 Mich at 172.

Based on our review of the record, the court's findings are amply supported by the testimony and documentation submitted. The record reflects that the superintendent first stated that she would deny consent to adopt before April 10, 2017, as Hallett and Carrier both testified that information was relayed to Carrier at the FTM held that day. At that point in time, a full investigation had not been conducted and the superintendent admitted such an investigation would typically take three months. Subsequently, on April 12, 2017, the superintendent unequivocally stated that she intended to deny Carrier consent to adopt. She made that statement to the Foster Care Review Board which relied on it and denied Carrier an appeal of the removal decision. Although the superintendent testified that she had not yet made up her mind at that point, her future actions belie that statement. Primarily, when Carrier successfully obtained a stay of the removal in circuit court, the MCI and Fostering Futures had a phone conference before the follow-up court hearing, during which it was stated that MCI's "position" was consent had been "verbally" denied and that the Foster Care Review Board should not hear the case. When the circuit court continued the stay and ordered the Foster Care Review Board to hear the case, the MCI e-mailed Fostering Futures with a request that they "complete the adoption denial request and route to [an MCI consultant] prior to [the superintendent's] return so that she can make a decision *prior to the next hearing or shortly after that*?" Hallett responded that an additional licensing investigation had been requested, but she would write the denial earlier at MCI's request. At the Section 45 hearing, she stated that it was her own decision to deny, but the trial court was not required to credit that decision, especially in light of the fact that Hallett repeatedly testified (and stated in writing) that she knew the superintendent's decision was going to be to deny consent. Given the above facts, it is unsurprising that the recommendation to deny was submitted before the Foster Care Review Board actually reviewed the removal decision. Furthermore, in light of the above, it is equally unsurprising that the Foster Care Review Board stated in its opinion that the superintendent had made a decision to deny consent to adopt to Carrier and that the decision would be finalized in June 2017.

We note that the decision was, in fact, not "finalized" until September 2017. However, the record reflects that the superintendent was aware that her decision would be challenged at a Section 45 hearing. In fact, she testified that she wanted an independent person to observe one of the visits so as to have an objective witness to testify. She also personally observed one of the visits. The court found that her reliance on RC's reluctance to engage Carrier was not, in fact, a

genuine reason for the removal decision. Based on the record before this Court, we are not left with a definite and firm conviction that this was a mistake.

The trial court did not commit clear legal error in its application of the standard of review. Further, it did not clearly err by finding that the superintendent's reasons for denying consent to adopt were arbitrary and capricious.

Affirmed.

/s/ Michael J. Kelly
/s/ Patrick M. Meter